*320 Chief Justice Roberts
delivered the opinion of the Court.
This case concerns the sale of fee land on a tribal reservation by a non-Indian bank to non-Indian individuals. Following the sale, an Indian couple, customers of the bank who had defaulted on their loans, claimed the bank discriminated against them by offering the land to non-Indians on terms more favorable than those the bank offered to them. The couple sued on that claim in Tribal Court; the bank contested the court’s jurisdiction. The Tribal Court concluded that it had jurisdiction and proceeded to hear the case. It ultimately ruled against the bank and awarded the Indian couple damages and the right to purchase a portion of the fee land. The question presented is whether the Tribal Court had jurisdiction to adjudicate a discrimination claim concerning the non-Indian bank’s sale of fee land it owned. We hold that it did not.
I
The Long Family Land and Cattle Company, Inc. (Long Company or Company), is a family-run ranching and farming operation incorporated under the laws of South Dakota. Its lands are located on the Cheyenne River Sioux Indian Reservation. Once a massive, 60-million acre affair, the reserva *321 tion was appreciably diminished by Congress in the 1880’s and at present consists of roughly 11 million acres located in Dewey and Ziebach Counties in north-central South Dakota. The Long Company is a respondent here, along with Ronnie and Lila Long, husband and wife, who together own at least 51 percent of the Company’s shares. Ronnie and Lila Long are both enrolled members of the Cheyenne River Sioux Indian Tribe.
The Longs and their Company have been customers for many years at Plains Commerce Bank (Bank), located some 25 miles off the reservation as the crow flies in Hoven, South Dakota. The Bank, like the Long Company, is a South Dakota corporation, but has no ties to the reservation other than its business dealings with tribal members. The Bank made its first commercial loan to the Long Company in 1989, and a series of agreements followed. As part of those agreements, Kenneth Long — Ronnie Long’s father and a non-Indian — mortgaged to the Bank 2,230 acres of fee land he owned inside the reservation. At the time of Kenneth Long’s death in the summer of 1995, Kenneth and the Long Company owed the Bank $750,000.
In the spring of 1996, Ronnie and Lila Long began negotiating a new loan contract with the Bank in an effort to shore up their Company’s flagging financial fortunes and come to terms with their outstanding debts. After several months of back-and-forth, the parties finally reached an agreement in December of that year — two agreements, to be precise. The Company and the Bank signed a fresh loan contract, according to which Kenneth Long’s estate deeded over the previously mortgaged fee acreage to the Bank in lieu of foreclosure. App. 104. In return, the Bank agreed to cancel some of the Company’s debt and to make additional operating loans. The parties also agreed to a lease arrangement: The Company received a two-year lease on the 2,230 acres, deeded over to the Bank, with an option to purchase the land at the end of the term for $468,000. Id., at 96-103.
*322 It is at this point, the Longs claim, that the Bank began treating them badly. The Longs say the Bank initially offered more favorable purchase terms in the lease agreement, allegedly proposing to sell the land back to the Longs with a 20-year contract for deed. The Bank eventually rescinded that offer, the Longs claim, citing “‘possible jurisdictional problems’ ” that might have been caused by the Bank financing an “‘Indian owned entity on the reservation.’” 491 F. 3d 878, 882 (CA8 2007) (case below).
Then came the punishing winter of 1996-1997. The Longs lost over 500 head of cattle in the blizzards that season, with the result that the Long Company was unable to exercise its option to purchase the leased acreage when the lease contract expired in 1998. Nevertheless, the Longs refused to vacate the property, prompting the Bank to initiate eviction proceedings in state court and to petition the Cheyenne River Sioux Tribal Court to serve the Longs with a notice to quit. In the meantime, the Bank sold 320 acres of the fee land it owned to a non-Indian couple. In June 1999, while the Longs continued to occupy a 960-acre parcel of the land, the Bank sold the remaining 1,910 acres to two other nonmembers.
In July 1999, the Longs and the Long Company filed suit against the Bank in the Tribal Court, seeking an injunction to prevent their eviction from the property and to reverse the sale of the land. They asserted a variety of claims, including breach of contract, bad faith, violation of tribal-law self-help remedies, and discrimination. The discrimination claim alleged that the Bank sold the land to nonmembers on terms more favorable than those offered the Company. The Bank asserted in its answer that the court lacked jurisdiction and also stated a counterclaim. The Tribal Court found that it had jurisdiction, denied the Bank’s motion for summary judgment on its counterclaim, and proceeded to trial. Four causes of action were submitted to the seven-member jury: *323 breach of contract, bad faith, violation of self-help remedies, and discrimination.
The jury found for the Longs on three of the four causes, including the discrimination claim, and awarded a $750,000 general verdict. After denying the Bank’s post-trial motion for judgment notwithstanding the verdict by finding again that it had jurisdiction to adjudicate the Longs’ claims, the Tribal Court entered judgment awarding the Longs $750,000 plus interest. A later supplemental judgment further awarded the Longs an option to purchase the 960 acres of the land they still occupied on the terms offered in the original purchase option, effectively nullifying the Bank’s previous sale of that land to non-Indians.
The Bank appealed to the Cheyenne River Sioux Tribal Court of Appeals, which affirmed the judgment of the trial court. The Bank then filed the instant action in the United States District Court for the District of South Dakota, seeking a declaration that the tribal judgment was null and void because, as relevant here, the Tribal Court lacked jurisdiction over the Longs’ discrimination claim. The District Court granted summary judgment to the Longs. The court found tribal court jurisdiction proper because the Bank had entered into a consensual relationship with the Longs and the Long Company. 440 F. Supp. 2d 1070, 1077-1078, 1080-1081 (2006). According to the District Court, this relationship brought the Bank within the first category of tribal civil jurisdiction over nonmembers outlined in Montana v. United States, 450 U. S. 544 (1981). See 440 F. Supp. 2d, at 1077-1078.
The Court of Appeals for the Eighth Circuit affirmed. 491 F. 3d 878. The Longs’ discrimination claim, the court held, “arose directly from their preexisting commercial relationship with the bank.” Id., at 887. When the Bank chose to deal with the Longs, it effectively consented to substantive regulation by the Tribe: An antidiscrimination tort claim *324 was just another way of regulating the commercial transactions between the parties. See ibid. In sum, the Tribe had authority to regulate the business conduct of persons who “voluntarily deal with tribal members,” including, here, a nonmember’s sale of fee land. Ibid.
We granted certiorari, 552 U. S. 1087 (2008), and now reverse.
II
Before considering the Tribal Court’s authority to adjudicate the discrimination claim, we must first address the Longs’ contention that the Bank lacks standing to raise this jurisdictional challenge in the first place. Though the Longs raised their standing argument for the first time before this Court, we bear an independent obligation to assure ourselves that jurisdiction is proper before proceeding to the merits. See Steel Co. v. Citizens for Better Environment, 523 U. S. 83, 94-95 (1998).
We begin by noting that whether a tribal court has adjudicative authority over nonmembers is a federal question. See Iowa Mut. Ins. Co. v. LaPlante, 480 U. S. 9, 15 (1987); National Farmers Union Ins. Cos. v. Crow Tribe, 471 U. S. 845, 852-853 (1985). If the tribal court is found to lack such jurisdiction, any judgment as to the nonmember is necessarily null and void. The Longs do not contest this settled principle but argue instead that the Bank has suffered no “injury in fact” as required by Article Ill’s case-or-controversy provision. See Lujan v. Defenders of Wildlife, 504 U. S. 555, 560 (1992).
The Longs appear to recognize their argument is somewhat counterintuitive. They concede the jury found the Bank guilty of discrimination and awarded them $750,000 plus interest. But the Longs contend the jury’s damages award was in fact premised entirely on their breach-of-contract rather than on their discrimination claim. The Bank does not presently challenge the breach-of-contract verdict.
*325 In support of their argument, the Longs point to their amended complaint in the Tribal Court. The complaint comprised nine counts. Several of the counts sought damages; the discrimination count did not. As relief for the discrimination claim, the Longs asked to be granted “possession and title to their land.” App. 173. The Longs contend that the damages award therefore had nothing to do with the discrimination claim. As a result, a decision from this Court finding no jurisdiction with respect to that claim — the only claim the Bank appeals — would not change anything.
We are not persuaded. The jury verdict form consisted of six special interrogatories, covering each claim asserted against the Bank, with another one covering the amount of damages to be awarded. Id., at 190-192. The damages interrogatory specifically allowed the jury to make an award after finding liability as to any of the individual claims: “If you answered yes to Numbers 1, 3, 4, or 5 what amount of damages should be awarded to the Plaintiffs?” Id., at 192 (emphasis added). The jury found against the Bank on three of the special interrogatories, including number 4, the discrimination claim. The Bank, the jurors found, “intentionally discriminate[d] against the Plaintiffs Ronnie and Lila Long.” Id., at 191. The jury then entered an award of $750,000. Id., at 192. These facts establish that the jury could have based its damages award, in whole or in part, on the finding of discrimination.
There is, in addition, the option to purchase. The Longs argue that requiring the Bank to void the sale to nonmembers of a 960-acre parcel and sell that parcel to them instead does not constitute injury in fact, because the Tribal Court actually denied the relief the Longs sought for the Bank’s discrimination. In its supplemental judgment, the Tribal Court refused to permit the Longs (or the Long Company) to purchase all the land — as they had requested — instead granting an option to purchase only the 960 acres the Longs occupied at the time. See Supplemental Judgment in *326 No. R-120-99, Long Family Land & Cattle Co. v. Maciejewski (Feb. 18, 2003), App. to Pet. for Cert. A-69 to A-70. Even this partial relief, the Longs insist, was crafted as an equitable remedy for their breach-of-contract claim, see Brief for Respondents 32-34, and in any event the Bank really suffered no harm, because it would gain as much income selling to the Longs as it did selling to the nonmembers, see id., at 34-35.
These arguments do not defeat the Bank’s standing. The Longs requested, as a remedy for the alleged discrimination, “possession and title” to the subject land. App. 173. They received an option to acquire a portion of exactly that. See App. to Pet. for Cert. A-69 to A-70. The Tribal Court’s silence in its supplemental judgment as to which claim, exactly, the option to purchase was meant to remedy is immaterial. See ibid. Of the four claims presented to the jury, only the discrimination claim sought deed to the land as relief. See Amended Complaint (Jan. 3, 2000), App. 158, 173. Nor does the fact that the remedial purchase option applied only to a portion of the total parcel eliminate the Bank’s injury. The Bank had no obligation to sell the land to the Longs before the Tribal Court’s judgment — indeed, the Bank had already sold the acreage to third parties. The Tribal Court judgment effectively nullified a portion of that sale. This judicially imposed burden certainly qualifies as an injury for standing purposes. As for the Longs’ speculation that the Bank would make as much money selling the land to them as it did selling the parcel to nonmembers, the argument is entirely beside the point. There is more than adequate injury in being compelled to undo one deed and enter into another — particularly with individuals who had previously defaulted on loans.
Both with respect to damages and the option to purchase, the Bank was injured by the Tribal Court’s exercise of jurisdiction over the discrimination claim. Those injuries can be remedied by a ruling in favor of the Bank that the Tribal *327 Court lacked jurisdiction and that its judgment on the discrimination claim is null and void. The ultimate collateral consequence of such a determination, whatever it may be— vacatur of the general damages award, vacatur of the option to purchase, a new trial on the other claims — does not alter the fact that the Bank has shown injury traceable to the challenged action and likely to be redressed by a favorable ruling. Allen v. Wright, 468 U. S. 737, 751 (1984). The Bank has Article III standing to pursue this challenge.
Ill
A
For nearly two centuries now, we have recognized Indian tribes as “distinct, independent political communities,” Worcester v. Georgia, 6 Pet. 515, 559 (1832), qualified to exercise many of the powers and prerogatives of self-government, see United States v. Wheeler, 435 U. S. 313, 322-323 (1978). We have frequently noted, however, that the “sovereignty that the Indian tribes retain is of a unique and limited character.” Id., at 323. It centers on the land held by the tribe and on tribal members within the reservation. See United States v. Mazurie, 419 U. S. 544, 557 (1975) (tribes retain authority to govern “both their members and their territory,” subject ultimately to Congress); see also Nevada v. Hicks, 533 U. S. 353, 392 (2001) (O’Connor, J., concurring in part and concurring in judgment) (“[T]ribes retain sovereign interests in activities that occur on land owned and controlled by the tribe”).
As part of their residual sovereignty, tribes retain power to legislate and to tax activities on the reservation, including certain activities by nonmembers, see Kerr-McGee Corp. v. Navajo Tribe, 471 U. S. 195, 201 (1985), to determine tribal membership, see Santa Clara Pueblo v. Martinez, 436 U. S. 49, 55 (1978), and to regulate domestic relations among members, see Fisher v. District Court of Sixteenth Judicial Dist. of Mont., 424 U. S. 382, 387-389 (1976) (per curiam). They *328 may also exclude outsiders from entering tribal land. See Duro v. Reina, 495 U. S. 676, 696-697 (1990). But tribes do not, as a general matter, possess authority over non-Indians who come within their borders: “[T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.” Montana, 450 U. S., at 565. As we explained in Oliphant v. Suquamish Tribe, 435 U. S. 191 (1978), the tribes have, by virtue of their incorporation into the American republic, lost “the right of governing . . . person[s] within their limits except themselves.” Id., at 209 (emphasis deleted; internal quotation marks omitted).
This general rule restricts tribal authority over nonmember activities taking place on the reservation, and is particularly strong when the nonmember’s activity occurs on land owned in fee simple by non-Indians — what we have called “non-Indian fee land.” Strate v. A-1 Contractors, 520 U. S. 438, 446 (1997) (internal quotation marks omitted). Thanks to the Indian General Allotment Act of 1887, 24 Stat. 388, as amended, 25 U. S. C. § 331 et seq., there are millions of acres of non-Indian fee land located within the contiguous borders of Indian tribes. See Atkinson Trading Co. v. Shirley, 532 U. S. 645, 648, 650, n. 1 (2001). The history of the General Allotment Act and its successor statutes has been well rehearsed in our precedents. See, e.g., Montana, supra, at 558-563; County of Yakima v. Confederated Tribes and Bands of Yakima Nation, 502 U. S. 251, 254-255 (1992). Suffice it to say here that the effect of the Act was to convert millions of acres of formerly tribal land into fee simple parcels, “fully alienable,” id., at 264, and “free of all charge or incumbrance whatsoever,” 25 U. S. C. § 348 (2000 ed., Supp. V). See F. Cohen, Handbook of Federal Indian Law § 16.03[2][b], pp. 1041-1042 (2005 ed.) (hereinafter Cohen).
Our cases have made clear that once tribal land is converted into fee simple, the tribe loses plenary jurisdiction over it. See County of Yakima, supra, at 267-268 (General Allotment Act permits Yakima County to impose ad valorem *329 tax on fee land located within the reservation); Goudy v. Meath, 203 U. S. 146, 149-150 (1906) (by rendering allotted lands alienable, General Allotment Act exposed them to state assessment and forced sale for taxes); In re Heff, 197 U. S. 488, 502-503 (1905) (fee land subject to plenary state jurisdiction upon issuance of trust patent (superseded by the Burke Act, 34 Stat. 182, 25 U. S. C. § 349 (2000 ed.))). Among the powers lost is the authority to prevent the land’s sale, see County of Yakima, supra, at 263 (General Allotment Act granted fee holders power of voluntary sale) — not surprisingly, as “free alienability” by the holder is a core attribute of the fee simple, C. Moynihan, Introduction to Law of Real Property §3, p. 32 (2d ed. 1988). Moreover, when the tribe or tribal members convey a parcel of fee land “to non-Indians, [the tribe] loses any former right of absolute and exclusive use and occupation of the conveyed lands.” South Dakota v. Bourland, 508 U. S. 679, 689 (1993) (emphasis added). This necessarily entails “the loss of regulatory jurisdiction over the use of the land by others.” Ibid. As a general rule, then, “the tribe has no authority itself, by way of tribal ordinance or actions in the tribal courts, to regulate the use of fee land.” Brendale v. Confederated Tribes and Bands of Yakima Nation, 492 U. S. 408, 430 (1989) (opinion of White, J.).
We have recognized two exceptions to this principle, circumstances in which tribes may exercise “civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands.” Montana, 450 U. S., at 565. First, “[a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements.” Ibid. Second, a tribe may exercise “civil authority over the conduct of non-Indians on fee lands within the reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare *330 of the tribe.” Id., at 566. These rules have become known as the Montana exceptions, after the case that elaborated them. By their terms, the exceptions concern regulation of “the activities of nonmembers” or “the conduct of non-Indians on fee land.”
Given Montana's “‘general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe,’ ” Atkinson, supra, at 651 (quoting Montana, supra, at 565), efforts by a tribe to regulate nonmembers, especially on non-Indian fee land, are “presumptively invalid,” Atkinson, supra, at 659. The burden rests on the tribe to establish one of the exceptions to Montana's general rule that would allow an extension of tribal authority to regulate nonmembers on non-Indian fee land. Atkinson, 532 U. S., at 654. These exceptions are “limited” ones, id., at 647, and cannot be construed in a manner that would “swallow the rule,” id., at 655, or “severely shrink” it, Strate, 520 U. S., at 458. The Bank contends that neither exception authorizes tribal courts to exercise jurisdiction over the Longs’ discrimination claim at issue in this case. We agree.
B
According to our precedents, “a tribe’s adjudicative jurisdiction does not exceed its legislative jurisdiction.” Id., at 453. We reaffirm that principle today and hold that the Tribal Court lacks jurisdiction to hear the Longs’ discrimination claim because the Tribe lacks the civil authority to regulate the Bank’s sale of its fee land.
The Longs’ discrimination claim challenges a non-Indian’s sale of non-Indian fee land. Despite the Longs’ attempt to recharacterize their claim as turning on the Bank’s alleged “failure to pay to respondents loans promised for cattle-raising on tribal trust land,” Brief for Respondents 47, in fact the Longs brought their discrimination claim “seeking to have the land sales set aside on the ground that the sale to nonmembers ‘on terms more favorable’ than the bank had *331 extended to the Longs” violated tribal tort law, 491 F. 3d, at 882 (quoting Plaintiffs’ Amended Complaint, App. 173). See also Brief for United States as Amicus Curiae 7. That discrimination claim thus concerned the sale of a 2,230-acre fee parcel that the Bank had acquired from the estate of a non-Indian.
The status of the land is relevant “insofar as it bears on the application of . . . Montana’s exceptions to [this] case.” Hicks, 533 U. S., at 376 (Souter, J., concurring). The acres at issue here were alienated from the Cheyenne River Sioux’s tribal trust and converted into fee simple parcels as part of the Act of May 27,1908, 35 Stat. 312, commonly called the 1908 Allotment Act. See Brief for Respondents 4, n. 2. While the General Allotment Act provided for the division of tribal land into fee simple parcels owned by individual tribal members, that Act also mandated that such allotments would be held in trust for their owners by the United States for a period of 25 years — or longer, at the President’s discretion — during which time the parcel owners had no authority to sell or convey the land. See 25 U. S. C. § 348 (2000 ed., and Supp. V). The 1908 Act released particular Indian owners from these restrictions ahead of schedule, vesting in them full fee ownership. See § 1, 35 Stat. 312. In 1934, Congress passed the Indian Reorganization Act, 48 Stat. 984, 25 U. S. C. § 461 et seq., which “pu[t] an end to further allotment of reservation land,” but did not “return allotted land to pre-General Allotment Act status, leaving it fully alienable by the allottees, their heirs, and assigns.” County of Yakima, 502 U. S., at 264.
The tribal tort law the Longs are attempting to enforce, however, operates as a restraint on alienation. It “set[s] limits on how nonmembers may engage in commercial transactions,” 491 F. 3d, at 887—and not just any transactions, but specifically nonmembers’ sale of fee lands they own. It regulates the substantive terms on which the Bank is able to offer its fee land for sale. Respondents and their principal *332 amicus, the United States, acknowledge that the tribal tort at issue here is a form of regulation. See Brief for Respondents 52; Brief for United States as Amicus Curiae 25-26; see also Riegel v. Medtronic, Inc., 552 U. S. 312, 324 (2008). They argue the regulation is fully authorized by the first Montana exception. They are mistaken.
Montana does not permit Indian tribes to regulate the sale of non-Indian fee land. Montana and its progeny permit tribal regulation of nonmember conduct inside the reservation that implicates the tribe’s sovereign interests. Montana expressly limits its first exception to the “activities of nonmembers,” 450 U. S., at 565, allowing these to be regulated to the extent necessary “to protect tribal self-government [and] to control internal relations,” id., at 564. See Big Horn Cty. Elec. Cooperative, Inc. v. Adams, 219 F. 3d 944, 951 (CA9 2000) (“Montana does not grant a tribe unlimited regulatory or adjudicative authority over a nonmember. Rather, Montana limits tribal jurisdiction under the first exception to the regulation of the activities of nonmembers” (internal quotation marks omitted; emphasis added)).
We cited four cases in explanation of Montana’s first exception. Each involved regulation of non-Indian activities on the reservation that had a discernible effect on the tribe or its members. The first concerned a Tribal Court’s jurisdiction over a contract dispute arising from the sale of merchandise by a non-Indian to an Indian on the reservation. See Williams v. Lee, 358 U. S. 217 (1959). The other three involved taxes on economic activity by nonmembers. See Washington v. Confederated Tribes of Colville Reservation, 447 U. S. 134, 152-153 (1980) (in cases where “the tribe has a significant interest in the subject matter,” tribes retain “authority to tax the activities or property of non-Indians taking place or situated on Indian lands”); Morris v. Hitchcock, 194 U. S. 384, 393 (1904) (upholding tribal taxes on nonmembers grazing cattle on Indian-owned fee land within tribal territory); Buster v. Wright, 135 F. 947, 950 (CA8 1905) *333 (Creek Nation possessed power to levy a permit tax on nonmembers for the privilege of doing business within the reservation).
Our cases since Montana have followed the same pattern, permitting regulation of certain forms of nonmember conduct on tribal land. We have upheld as within the tribe’s sovereign authority the imposition of a severance tax on natural resources removed by nonmembers from tribal land. See Merrion v. Jicarilla Apache Tribe, 455 U. S. 130 (1982). We have approved tribal taxes imposed on leasehold interests held in tribal lands, as well as sales taxes imposed on nonmember businesses within the reservation. See Kerr-McGee, 471 U. S., at 196-197. We have similarly approved licensing requirements for hunting and fishing on tribal land. See New Mexico v. Mescalero Apache Tribe, 462 U. S. 324, 337 (1983).
Tellingly, with only “one minor exception, we have never upheld under Montana the extension of tribal civil authority over nonmembers on non-Indian land” Hicks, supra, at 360 (emphasis added). See Atkinson, 532 U. S., at 659 (Tribe may not tax nonmember activity on non-Indian fee land); Strate, 520 U. S., at 454, 457 (tribal court lacks jurisdiction over tort suit involving an accident on nontribal land); Montana, supra, at 566 (Tribe has no authority to regulate nonmember hunting and fishing on non-Indian fee land). The exception is Brendale v. Confederated Tribes and Bands of Yakima Nation, 492 U. S. 408, and even it fits the general rubric noted above: In that case, we permitted a Tribe to restrain particular uses of non-Indian fee land through zoning regulations. While a six-Justice majority held that Montana did not authorize the Yakima Nation to impose zoning regulations on non-Indian fee land located in an area of the reservation where nearly half the acreage was owned by nonmembers, 492 U. S., at 430-431 (opinion of White, J.); id., at 444-447 (opinion of Stevens, J.), five Justices concluded that Montana did permit the Tribe to impose different zoning restrictions on nonmember fee land isolated in *334 “the heart of [a] closed portion of the reservation,” 492 U. S., at 440 (opinion of Stevens, J.), though the Court could not agree on a rationale, see id., at 443-444 (same); id., at 458-459 (opinion of Blackmun, J.).
But again, whether or not we have permitted regulation of nonmember activity on non-Indian fee land in a given case, in no case have we found that Montana authorized a tribe to regulate the sale of such land. Rather, our Montana cases have always concerned nonmember conduct on the land. See, e. g., Hicks, 533 U. S., at 359 (Montana and Strate concern “tribal authority to regulate nonmembers’ activities on [fee] land” (emphasis added)); Atkinson, 532 U. S., at 647 (“conduct of nonmembers on non-Indian fee land”); id., at 660 (Souter, J., concurring) (“the activities of nonmembers”); Bourland, 508 U. S., at 689 (“use of the land”); Brendale, supra, at 430 (“use of fee land”); Montana, supra, at 565 (first exception covers “activities of nonmembers”).[1]
The distinction between sale of the land and conduct on it is well established in our precedent, as the foregoing cases demonstrate, and entirely logical given the limited nature of tribal sovereignty and the liberty interests of nonmembers. By virtue of their incorporation into the United States, the tribe’s sovereign interests are now confined to managing tribal land, see Worcester, 6 Pet., at 561 (persons are allowed to enter Indian land only “with the assent of the [tribal members] themselves”), “protecting] tribal self-government,” and “controlling] internal relations,” see Montana, supra, at 564. The logic of Montana is that certain activities on non-Indian fee land (say, a business enterprise employing *335 tribal members) or certain uses (say, commercial development) may intrude on the internal relations of the tribe or threaten tribal self-rule. To the extent they do, such activities or land uses may be regulated. See Hicks, supra, at 361 (“Tribal assertion of regulatory authority over nonmembers must be connected to that right of the Indians to make their own laws and be governed by them”). Put another way, certain forms of nonmember behavior, even on non-Indian fee land, may sufficiently affect the tribe as to justify tribal oversight. While tribes generally have no interest in regulating the conduct of nonmembers, then, they may regulate nonmember behavior that implicates tribal governance and internal relations.
The regulations we have approved under Montana all flow directly from these limited sovereign interests. The tribe’s “traditional and undisputed power to exclude persons” from tribal land, Duro, 495 U. S., at 696, for example, gives it the power to set conditions on entry to that land via licensing requirements and hunting regulations. See Bourland, supra, at 691, n. 11 (“Regulatory authority goes hand in hand with the power to exclude”). Much taxation can be justified on a similar basis. See Colville, 447 U. S., at 153 (taxing power “may be exercised over . . . nonmembers, so far as such nonmembers may accept privileges of trade, residence, etc., to which taxes may be attached as conditions” (quoting Powers of Indian Tribes, 55 I. D. 14, 46 (1934); some emphasis added)). The power to tax certain nonmember activity can also be justified as “a necessary instrument of self-government and territorial management,” Merrion, 455 U. S., at 137, insofar as taxation “enables a tribal government to raise revenues for its essential services,” to pay its employees, to provide police protection, and in general to carry out the functions that keep peace and order, ibid.
Justice Ginsburg wonders why these sorts of regulations are permissible under Montana but regulating the sale of fee land is not. See post, at 347. The reason is that regu *336 lation of the sale of non-Indian fee land, unlike the above, cannot be justified by reference to the tribe’s sovereign interests. By definition, fee land owned by nonmembers has already been removed from the tribe’s immediate control. See Strate, 520 U. S., at 456 (tribes lack power to “assert [over non-Indian fee land] a landowner’s right to occupy and exclude”). It has already been alienated from the tribal trust. The tribe cannot justify regulation of such land’s sale by reference to its power to superintend tribal land, then, because non-Indian fee parcels have ceased to be tribal land.
Nor can regulation of fee land sales be justified by the tribe’s interests in protecting internal relations and self-government. Any direct harm to its political integrity that the tribe sustains as a result of fee land sale is sustained at the point the land passes from Indian to non-Indian hands. It is at that point the tribe and its members lose the ability to use the land for their purposes. Once the land has been sold in fee simple to non-Indians and passed beyond the tribe’s immediate control, the mere resale of that land works no additional intrusion on tribal relations or self-government. Resale, by itself, causes no additional damage.
This is not to suggest that the sale of the land will have no impact on the tribe. The uses to which the land is put may very well change from owner to owner, and those uses may well affect the tribe and its members. As our cases bear out, see supra, at 333-335, the tribe may quite legitimately seek to protect its members from noxious uses that threaten tribal welfare or security, or from nonmember conduct on the land that does the same. But the key point is that any threat to the tribe’s sovereign interests flows from changed uses or nonmember activities, rather than from the mere fact of resale. The tribe is able fully to vindicate its sovereign interests in protecting its members and preserving tribal self-government by regulating nonmember activity on the land, within the limits set forth in our cases. The *337 tribe has no independent interest in restraining alienation of the land itself, and thus, no authority to do so.
Not only is regulation of fee land sale beyond the tribe’s sovereign powers, it runs the risk of subjecting nonmembers to tribal regulatory authority without commensurate consent. Tribal sovereignty, it should be remembered, is “a sovereignty outside the basic structure of the Constitution.” United States v. Lara, 541 U. S. 193, 212 (2004) (Kennedy, J., concurring in judgment). The Bill of Rights does not apply to Indian tribes. See Taiton v. Mayes, 163 U. S. 376, 382-385 (1896). Indian courts “differ from traditional American courts in a number of significant respects.” Hicks, 533 U. S., at 383 (Souter, J., concurring). And nonmembers have no part in tribal government—they have no say in the laws and regulations that govern tribal territory. Consequently, those laws and regulations may be fairly imposed on nonmembers only if the nonmember has consented, either expressly or by his actions. Even then, the regulation must stem from the tribe’s inherent sovereign authority to set conditions on entry, preserve tribal self-government, or control internal relations. See Montana, 450 U. S., at 564.
In commenting on the policy goals Congress adopted with the General Allotment Act, we noted that “[t]here is simply no suggestion” in the history of the Act “that Congress intended that the non-Indians who would settle upon alienated allotted lands would be subject to tribal regulatory authority.” Id., at 560, n. 9. In fact, we said it “defies common sense to suppose” that Congress meant to subject non-Indians to tribal jurisdiction simply by virtue of the nonmember’s purchase of land in fee simple. Ibid. If Congress did not anticipate tribal jurisdiction would run with the land, we see no reason why a nonmember would think so either.
The Longs point out that the Bank in this case could hardly have been surprised by the Tribe’s assertion of regu *338 latory power over the parties’ business dealings. The Bank, after all, had “lengthy on-reservation commercial relationships with the Long Company.” Brief for Respondents 40. Justice Ginsburg echoes this point. See post, at 345. But as we have emphasized repeatedly in this context, when it comes to tribal regulatory authority, it is not “in for a penny, in for a Pound.” Atkinson, 532 U. S., at 656 (internal quotation marks omitted). The Bank may reasonably have anticipated that its various commercial dealings with the Longs could trigger tribal authority to regulate those transactions — a question we need not and do not decide. But there is no reason the Bank should have anticipated that its general business dealings with respondents would permit the Tribe to regulate the Bank’s sale of land it owned in fee simple.
Even the courts below recognized that the Longs’ discrimination claim was a “novel” one. 491 F. 3d, at 892. It arose “directly from Lakota tradition as embedded in Cheyenne River Sioux tradition and custom,” including the Lakota “sense of justice, fair play and decency to others.” 440 F. Supp. 2d, at 1082 (internal quotation marks omitted). The upshot was to require the Bank to offer the same terms of sale to a prospective buyer who had defaulted in several previous transactions with the Bank as it offered to a different buyer without such a history of default. This is surely not a typical regulation. But whatever the Bank anticipated, whatever “consensual relationship” may have been established through the Bank’s dealing with the Longs, the jurisdictional consequences of that relationship cannot extend to the Bank’s subsequent sale of its fee land.
The Longs acknowledge, if obliquely, the critical importance of land status. They emphasize that the Long Company “operated on reservation fee and trust lands,” Brief for Respondents 40, and n. 24, 41, and note that “the fee land at issue in the lease-repurchase agreement” had previously *339 belonged to a tribal member, id., at 47. These facts, however, do not change the status of the land at the time of the challenged sale. Regardless of where the Long Company operated, the fee land whose sale the Longs seek to restrain was owned by the Bank at the relevant time. And indeed, before that, it was owned by Kenneth Long, a non-Indian. See Hicks, supra, at 382, n. 4 (Souter, J., concurring) (“Land status . . . might well have an impact under one (or perhaps both) of the Montana exceptions”); Atkinson, supra, at 659 (Souter, J., concurring) (status of territory as “tribal or fee land may have much to do (as it does here) with the likelihood (or not) that facts will exist that are relevant under the [Montana] exceptions”).
The Longs attempt to salvage their position by arguing that the discrimination claim is best read to challenge the Bank’s whole course of commercial dealings with the Longs stretching back over a decade — not just the sale of the fee land. Brief for Respondents 44. That argument is unavailing. The Longs are the first to point out that their breach-of-contract and bad-faith claims, which do involve the Bank’s course of dealings, are not before this Court. Ibid. Only the discrimination claim is before us and that claim is tied specifically to the sale of the fee land.[2] Ibid. Count six of the Longs’ amended complaint in the Tribal Court alleges that “[i]n selling the Longs’ land, [Plains Commerce Bank] unfairly discriminated against the Company and the Longs.” App. 172-173 (emphasis added). As relief, the Longs *340 claimed they “should get possession and title to their land back.” Id., at 173. The Longs’ discrimination claim, in short, is an attempt to regulate the terms on which the Bank may sell the land it owns.[3]
Such regulation is outside the scope of a tribe’s sovereign authority. Justice Ginsburg asserts that if “[t]he Federal Government and every State, county, and municipality can make nondiscrimination the law governing ... real property transactions,” tribes should be able to do so as well. Post, at 348-349. This argument completely overlooks the very reason cases like Montana and this one arise: Tribal jurisdiction, unlike the jurisdiction of the other governmental entities cited by Justice Ginsburg, generally does not extend to nonmembers. See Montana, 450 U. S., at 565. The sovereign authority of Indian tribes is limited in ways state and federal authority is not. Contrary to Justice Ginsburg’s suggestion, that bedrock principle does not vary depending on the desirability of a particular regulation.
Montana provides that, in certain circumstances, tribes may exercise authority over the conduct of nonmembers, even if that conduct takes place on non-Indian fee land. But conduct taking place on the land and the sale of the land are two very different things. The Cheyenne River Sioux Tribe lost the authority to restrain the sale of fee simple parcels inside their borders when the land was sold as part of the 1908 Allotment Act. Nothing in Montana gives it back.
C
Neither the District Court nor the Court of Appeals relied for its decision on the second Montana exception. The *341 Eighth Circuit declined to address the exception’s applicability, see 491 F. 3d, at 888, n. 7, while the District Court strongly suggested in passing that the second exception would not apply here, see 440 F. Supp. 2d, at 1077. The District Court is correct, for the same reasons we explained above. The second Montana exception stems from the same sovereign interests that give rise to the first, interests that do not reach to regulating the sale of non-Indian fee land.
The second exception authorizes the tribe to exercise civil jurisdiction when non-Indians’ “conduct” menaces the “political integrity, the economic security, or the health or welfare of the tribe.” Montana, 450 U. S., at 566. The conduct must do more than injure the tribe, it must “imperil the subsistence” of the tribal community. Ibid. One commentator has noted that “th[e] elevated threshold for application of the second Montana exception suggests that tribal power must be necessary to avert catastrophic consequences.” Cohen § 4.02[3][c], at 232, n. 220.
The sale of formerly Indian-owned fee land to a third party is quite possibly disappointing to the Tribe, but cannot fairly be called “catastrophic” for tribal self-government. See Strate, 520 U. S., at 459. The land in question here has been owned by a non-Indian party for at least 50 years, Brief for Respondents 4, during which time the project of tribal self-government has proceeded without interruption. The land’s resale to another non-Indian hardly “imperil[s] the subsistence or welfare of the Tribe.” Montana, supra, at 566. Accordingly, we hold the second Montana exception inapplicable in this case.
D
Finally, we address the Longs’ argument that the Bank consented to tribal court jurisdiction over the discrimination claim by seeking the assistance of tribal courts in serving a notice to quit. Brief for Respondents 44-46. When the Longs refused to vacate the land, the Bank initiated eviction *342 proceedings in South Dakota state court. The Bank then asked the Tribal Court to appoint a process server able to reach the Longs. Seeking the Tribal Court’s aid in serving process on tribal members for a pending state-court action does not, we think, constitute consent to future litigation in the Tribal Court. Notably, when the Longs did file their complaint against the Bank in Tribal Court, the Bank promptly contended in its answer that the court lacked jurisdiction. Brief for United States as Amicus Curiae 7. Under these circumstances, we find that the Bank did not consent by its litigation conduct to tribal court jurisdiction over the Longs’ discrimination claim.
* * *
The judgment of the Court of Appeals for the Eighth Circuit is reversed.

It is so ordered.

 Justice Ginsburg questions this distinction between sales and activities on the ground that “[s]ales of land — and related condúet — are surely ‘activities’ within the ordinary sense of the word.” Post, at 347 (dissenting opinion). We think the distinction is readily understandable. In any event, the question is not whether a sale is, in some generic sense, an action. The question is whether land ownership and sale are “activities” within the meaning of Montana and the other cited precedents.

Justice Ginsburg contends that if the Tribal Court has jurisdiction over the Longs’ other claims, it is hard to understand why jurisdiction would not also extend to the discrimination claim. Post, at 348. First, we have not said the Tribal Court has jurisdiction over the other claims: That question is not before us and we decline to speculate as to its answer. Moreover, the claims on which the Longs prevailed concern breach of a loan agreement, see App. 190, and bad faith in connection with Bureau of Indian Affairs loan guarantees, see id., at 192. The present claim involves substantive regulation of the sale of fee land.

 We point to the relief requested by the Longs — and partially granted by the Tribal Court — to rebut the Longs’ contention that their claim did not focus on the sale of the fee land. Contrary to Justice Ginsburg’s assertion, however, the nature of this remedy does not drive our jurisdictional ruling. See post, at 351-352. The remedy is invalid because there is no jurisdiction, not the other way around.