#26205-rem-SLZ

**2013 S.D. 5**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA
* * * *

MARCELINE MCGUIRE, CHARLOTTE
HARTEL, VIRGINIA STOREY,
PATRICIA SIMMERS, DONNA
BOWKER, CAROLINA BECKER and
DONALD BECKER,                                          Plaintiffs and Appellees,


        v.

PATRICK ABERLE and
CARLETTA ABERLE,                                       Defendants and Appellants,

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
DEWEY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JOHN W. BASTIAN
Judge

* * * *

PATRICIA A. MEYERS
Rapid City, South Dakota                    Attorney for plaintiffs
                                            and appellees.


STEVEN C. EMERY
Eagle Butte, South Dakota


        and


GEORGE J. NELSON of
Abourezk Law Firm, PC
Rapid City, South Dakota                    Attorneys for defendants
                                            and appellants.

* * * *

ARGUED NOVEMBER 6, 2012
OPINION FILED **01/16/13**

ZINTER, Justice

[¶1.]      In 1967, Raymond and Margaret Becker's eight children each inherited an undivided one-eighth interest in patented fee land located within the exterior boundaries of the Cheyenne River Sioux Indian Reservation. None of the Beckers are Indians. In 2006, one of the Becker children sold her undivided one-eighth interest to Patrick and Carletta Aberle. Patrick is a member of the Cheyenne River Sioux Tribe. Carletta is a non-Indian. Patrick subsequently conveyed his interest to his son.[1] Before this suit, Patrick's son transferred the property back to Patrick.[2] As a result, Patrick and Carletta each own an undivided one-sixteenth interest.

[¶2.]      Sometime after Patrick and Carletta initially acquired their interests, a dispute arose between the Aberles and the Becker children who still retained an interest in the property. The Becker children commenced this action in circuit court, seeking a sale of the entire property. The Aberles counterclaimed for partition. Patrick also moved to dismiss for lack of subject matter jurisdiction. Patrick argued that because he was a member of the Tribe, and because he had become an owner of an undivided one-sixteenth interest in property on the Reservation, the circuit court possessed no subject matter jurisdiction to adjudicate

---

1.    There is some uncertainty regarding this transfer. The record suggests that Patrick may have owned the property for approximately four months before he transferred it to his son. At oral argument, however, the Becker children contended that Patrick only owned the property for one day before the transfer to his son. The Becker children also argued that Patrick's son is not a member of the Cheyenne River Sioux Tribe.

2.    The record does not disclose the reason for Patrick's reacquisition of the property.

the dispute between the parties.[3] Aberles contended the Cheyenne River Sioux Tribal Court had jurisdiction.

[¶3.] The court denied the motion, determining that the "ownership of fifteen-sixteenths of the property has continually been in the possession of [non-Indians,]" and therefore, state jurisdiction did not infringe upon tribal sovereignty. After a trial, the circuit court ordered a sale of the entire property. Aberles appeal, contesting both South Dakota courts' subject matter jurisdiction and the order of sale.[4] The jurisdiction question must be resolved before addressing the merits.

[¶4.] Both the Aberles and the Tribe argue that the jurisdiction question is controlled by *Williams v. Lee*: "[A]bsent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." 358 U.S. 217, 220, 79 S. Ct. 269, 271, 3 L. Ed. 2d 251 (1959). As a threshold matter in state-tribal jurisdiction disputes, courts often examine Acts of Congress and treaties to determine the status

---

3. Patrick also moved to dismiss for lack of personal jurisdiction. That motion was not ruled upon by the circuit court and Patrick has not appealed the issue of personal jurisdiction. The issue has been waived.

4. The Cheyenne River Sioux Tribe, through its counsel Steven C. Emery, appears as amici in support of the Aberles' appeal. Shortly before oral argument, Emery also entered a notice of appearance on behalf of the Aberles. Emery argued the jurisdiction issue and George J. Nelson argued the sale/partition issue.

of the land at issue and its alienability,[5] especially when the land was alienated by

allotment acts during the allotment era.[6]

---

5.    *See Goudy v. Meath,* 203 U.S. 146, 146-50, 27 S. Ct. 48, 49, 51 L. Ed. 130 (1906) (holding that a county's assessment of ad valorem tax on land owned by an Indian was permissible because the land was freely alienable under a federal treaty and subsequently, the General Allotment Act and a state Act); *Keweenaw Bay Indian Cmty. v. Naftaly,* 452 F.3d 514, 524, 527-33 (6th Cir. 2006) (finding no state jurisdiction to assess ad valorem tax on reservation lands allotted by treaty prior to allotment era because the treaty placed restriction on alienation of the land); *Lummi Indian Tribe v. Whatcom Cnty.,* 5 F.3d 1355, 1356-59 (9th Cir. 1993) (finding state jurisdiction for ad valorem taxation of land acquired by a tribe because the land was originally allotted under a treaty and restrictions on alienation were lifted). *See also South Carolina v. Catawba Indian Tribe, Inc.,* 476 U.S. 498, 507-08, 106 S. Ct. 2039, 2044-46, 90 L. Ed. 2d 490 (1986) (deciding that although a federal Act's explicit incorporation of state law controlled, also stating that "[w]e have long recognized that, when Congress removes restraints on alienation by Indians, state laws are fully applicable to subsequent claims[ ]"); *Oneida Indian Nation of N.Y. v. Oneida Cnty.,* 414 U.S. 661, 675-76, 94 S. Ct. 772, 781-82, 39 L. Ed. 2d 73 (1974) (considering a claim of a right to possession of land, stating that "[o]nce patent issues, the incidents of ownership are, for the most part, matters of local property law to be vindicated in local courts . . . [ ]"). Although many of these cases involved the question whether a state had jurisdiction to tax land, the cases necessarily involved the broader question whether the state had jurisdiction because of the land's status.

6.    *See Cass Cnty. v. Leech Lake Band of Chippewa Indians,* 524 U.S. 103, 106-15, 118 S. Ct. 1904, 1906-11, 141 L. Ed. 2d 90 (1998) (finding state jurisdiction for ad valorem taxation of reservation land that was alienated during the allotment period and reacquired by the Tribe); *Cnty of Yakima v. Confederated Tribes & Bands of Yakima Indian Nation,* 502 U.S. 251, 253-68, 270, 112 S. Ct. 683, 685-94, 116 L. Ed. 2d 687 (1992) (finding state jurisdiction for ad valorem taxation of reservation land that was previously allotted to Indians and non-Indians under the General Allotment Act). *See also Larkin v. Paugh,* 276 U.S. 431, 435-36, 438-39, 48 S. Ct. 366, 367-68, 72 L. Ed. 640 (1928) (reviewing state court adjudication of competing claims between a non-Indian and heirs of Indian allottee, stating that "[w]ith the issue of the patent, the title not only passed from the United States, but the prior trust and the incidental restriction against alienation were terminated. This put an end to the authority theretofore possessed by the Secretary of the Interior by reason of the trust and restriction—so that thereafter all

(continued . . .)

[¶5.]    The Supreme Court has identified the relevant allotment acts affecting Cheyenne River Sioux Reservation lands that were alienated during the allotment era. *See South Dakota v. Bourland*, 508 U.S. 679, 682-83, 692-93, 113 S. Ct. 2309, 2313, 2318, 124 L. Ed. 2d 606 (1993) (discussing the General Allotment Act of 1887, ch. 119, 24 Stat. 388 (amended by the Burke Act, ch. 2348, 34 Stat. 182 (1906)); the Act of Mar. 2, 1889, ch. 405, 25 Stat. 888; and the Act of May 29, 1908, ch. 218, 35 Stat. 460).[7]  Additionally, in a different jurisdictional context, the Supreme Court has discussed the effects of various allotment acts on Cheyenne River Sioux Reservation lands.  *See Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 128 S. Ct. 2709, 171 L. Ed. 2d 457 (2008).  "[T]he effect of the [General Allotment] Act [and its successor Acts] was to convert millions of acres of formerly tribal land into fee simple parcels, 'fully alienable,' and 'free of all charge or incumbrance whatsoever.'"  *Id.* at 328, 128 S. Ct. at 2719 (internal citations omitted) (citing F. Cohen, *Handbook of Federal Indian Law* § 16.03[2][b], 1041-42 (2005 ed.)).  The Supreme Court further stated that "once tribal land is converted into fee simple, the tribe loses plenary jurisdiction over it." *Id.*  "As a general rule,

---

( . . . continued)

    questions pertaining to the title were subject to examination and determination by the courts, appropriately those in Nebraska [state court], the land being there[ ]").  Similar to footnote 4, two of these cases involved the question whether a state had jurisdiction to tax land, but the cases necessarily involved the broader question whether the state had jurisdiction because of the land's status.

7.    The Act of June 23, 1910, ch. 369, 36 Stat. 602, also authorized the sale of unalloted lands on the Cheyenne River Sioux Reservation.  That Act was not at issue in *Bourland*.

then, 'the tribe has no authority itself, by way of tribal ordinance or actions in the tribal courts, to regulate the use of fee land.'" *Id.* at 329, 128 S. Ct. at 2719 (quoting *Brendale v. Confederated Tribes & Bands of Yakima Nation,* 492 U.S. 408, 430, 109 S. Ct. 2994, 3008, 106 L. Ed. 2d 343 (1989)). *Bourland* stated that the Cheyenne River Sioux Tribe's loss of lands through other Acts of Congress may also eliminate tribal jurisdiction: "[A]n abrogated treaty right of unimpeded use and occupation of lands 'can no longer serve as the basis for tribal exercise of the lesser included power' to regulate." 508 U.S. at 691, 113 S. Ct. at 2317 (quoting *Brendale,* 492 U.S. at 424, 109 S. Ct. at 3004).[8]

[¶6.]     Although *Plains Commerce Bank* did not involve land in which a tribal member owned an interest, the Supreme Court cited three cases generally finding state jurisdiction over patented fee lands; i.e. those that had been alienated from tribes by the General Allotment Act:

> *See County of Yakima*, [502 U.S. at 267-68, 112 S. Ct. at 683] (General Allotment Act permits Yakima County to impose ad valorem tax on fee land located within the reservation); *Goudy v. Meath,* 203 U.S. 146, 149-150, 27 S. Ct. 48, 51 L. Ed. 130 (1906) (by rendering allotted lands alienable, General Allotment Act exposed them to state assessment and forced sale for taxes); *In re Heff,* 197 U.S. 488, 502-503, 25 S. Ct. 506, 49 L. Ed. 848 (1905) (fee land subject to plenary state jurisdiction upon issuance of trust patent (superseded by the Burke Act, 34 Stat. 182, 25 U.S.C. § 349 (2000 ed.))).

554 U.S. at 328-29, 128 S. Ct. at 2719. The Supreme Court's language in all of the foregoing cases suggests that if the Becker/Aberle patented fee land was alienated

---

8.     We acknowledge the distinction between cases involving state jurisdiction over Reservation land and tribal authority to regulate the conduct of individuals on land within the exterior boundaries of the Reservation.

under "allotment acts," the Cheyenne River Sioux Tribal Court may not have exclusive jurisdiction.

[¶7.] But the problem in this case is that the record does not reflect how and under what authority the land in question was initially alienated. That is significant because counsel for the Tribe and Aberles contended at oral argument that this land could not have been alienated under the General Allotment Act of 1887 (the Cheyenne River Sioux Reservation was not created until 1889).[9] Counsel also argued that we should read the 1908 Act differently than the General Allotment Act.[10] Moreover, counsel for the Becker children agreed that the nature

---

9. "[T]he Cheyenne River Sioux Reservation[ ] [was] established by Congress in the Act of March 2, 1889, ch. 405, § 4, 25 Stat. 889." *Solem v. Bartlett*, 465 U.S. 463, 465, 104 S. Ct. 1161, 1163, 79 L. Ed. 2d 443 (1984). Nevertheless, the 1887 General Allotment Act and its amendments affected tribal lands after 1887. Aberles and the Tribe should clarify their position on remand.

10. Counsel mentioned the Supreme Court's holding in *Solem v. Bartlett*, a case involving the Cheyenne River Sioux Reservation. We acknowledge that in *Solem*, the Supreme Court stated:

> Congress passed a series of surplus land acts at the turn of the century to force Indians onto individual allotments carved out of reservations and to open up unallotted lands for non-Indian settlement. Initially, Congress legislated its Indian allotment program on a national scale [e.g. through the General Allotment Act of 1887, ch. 119, 24 Stat. 388 *et seq*.], but by the time of the Act of May 29, 1908, Congress was dealing with the surplus land question on a reservation-by-reservation basis, with each surplus land act employing its own statutory language, the product of a unique set of tribal negotiation and legislative compromise.

465 U.S. at 466-67, 104 S. Ct. at 1164 (footnote omitted). *Solem*, however, was a diminishment case. The circuit court should determine the validity of counsel's argument on remand.

of the patent and the Act under which it was granted is important to the jurisdiction question. But that information is not reflected in this record.

[¶8.] In light of the status of the record, we remand this matter to the circuit court to reconsider the jurisdiction question after further development of a factual record and consideration of the land alienation cases. The factual record should include: identification of the Act of Congress under which the land was alienated; when the land was patented; to whom it was patented; the subsequent history of title showing the extent of Indian and Tribal ownership; and the circumstances under which Patrick transferred his ownership interest to his son and subsequently reacquired that interest. To clarify all potential questions, the parties may present new evidence and the court may reconsider all issues in this case.

[¶9.] GILBERTSON, Chief Justice, and KONENKAMP, SEVERSON, and WILBUR, Justices, concur.