*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ROZELLA SIMMONDS and JEFF SIMMONDS, | ) ) ) | Supreme Court No. S-14103 |
| Petitioners, | ) ) | Superior Court No. 4FA-09-02508 CI |
| v. | ) ) | O P I N I O N |
| EDWARD PARKS and BESSIE STEARMAN, | ) ) ) | No. 6926 – July 18, 2014 |
| Respondents, | ) ) | |
| and | ) ) | |
| STATE OF ALASKA, | ) ) | |
| Intervenor-Respondent. | ) ) | |

Petition for Review from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Paul R. Lyle, Judge.

Appearances: Erin C. Dougherty, Natalie A. Landreth, Heather Kendall-Miller, and Matthew N. Newman, Native American Rights Fund, Anchorage, for Petitioners. Jason A. Weiner, Gazewood & Weiner, P.C., Fairbanks, for Respondent Parks. Michael J. Wenstrup, Fairbanks, for Respondent Stearman. Mary Ann Lundquist, Senior Assistant Attorney General, Fairbanks, Julie Fields and Jacqueline Schafer, Assistant Attorneys General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Intervenor-Respondent. Marguerite Humm, Holly Handler,

and Sydney Tarzwell, Alaska Legal Services Corporation, Anchorage, for Amici Curiae Kenaitze Indian Tribe, Native Village of Eek, Stony River Traditional Council, Native Village of Mekoryuk, Umkumiut Tribal Council, and Tuntutuliak Traditional Council.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

FABE, Chief Justice.

## I.      INTRODUCTION

The Minto Tribal Court terminated the parental rights of Edward Parks and Bessie Stearman to their daughter S.P.  At the termination hearing, the attorney for Parks and Stearman was not permitted to present oral argument to the tribal court.  Parks failed to file an appeal with the Minto Court of Appeals and instead brought suit against S.P.'s foster parents, the Simmondses, in the state superior court in an attempt to regain custody of S.P.  The Simmondses moved to dismiss Parks's state lawsuit on the basis that the tribal court judgment terminating parental rights was entitled to full faith and credit under the Indian Child Welfare Act.  The superior court denied the motion to dismiss, concluding that full faith and credit should not be afforded because the tribal court had denied Parks minimum due process by prohibiting his attorney from presenting oral argument on his objections to tribal court jurisdiction based on his status as a non-tribal member.  Although the superior court recognized that oral argument is not a per se requirement of minimum due process, the superior court concluded that the denial of oral argument in this case deprived Parks of a meaningful opportunity to be heard because Parks did not receive sufficient notice that his attorney would not be allowed to present oral argument to the tribal court.

The Simmondses petitioned this court for review. We remanded to the superior court for further findings. On remand, the superior court reiterated its prior conclusion of a violation of minimum due process and further concluded that the due process error was not harmless because Parks's objections to the Minto Tribal Court's jurisdiction might have had merit. The Simmondses brought a second petition for review, and we again granted review. Because Parks failed to exhaust his remedies in the Minto Court of Appeals, we conclude that his state court suit should have been dismissed. We thus reverse the superior court's decision and remand for dismissal of Parks's suit.

## II.     FACTS AND PROCEEDINGS

### A.     Tribal Affiliations Of S.P. And Her Parents

This petition is the culmination of almost six years of litigation involving custody of S.P., the parental rights of her parents, Edward Parks and Bessie Stearman, and the jurisdiction of the Minto Tribal Court. Stearman is a member of the Native Village of Minto, a federally recognized tribe in Minto, Alaska.[1] She was raised and resided in Minto until 2001. Parks is an enrolled member of the Native Village of Stevens, a federally recognized tribe in Stevens Village, Alaska.[2] Parks is not a member of the Native Village of Minto and has never lived in or been a resident of Minto.

The Minto Tribal Constitution provides that lineal descendants of tribal members are "automatically eligible to be members of the Minto Tribe," and the Minto Tribal Court concluded on a number of occasions that "[u]nder the tribal constitution of Minto [S.P.] is a Minto tribal member under the jurisdiction of the Tribal Court and

---

[1]     Indian Entities Recognized and Eligible to Receive Services from the Bureau of Indian Affairs, 77 Fed. Reg. 47,868, 47,872-73 (Aug. 10, 2012) (providing the current list of federally recognized tribes).

[2]     *Id.* We refer to the Native Village of Stevens as Stevens Village.

eligible to apply for enrollment." In November 2008, during the course of the Minto Tribal Court's custody proceedings, S.P. was formally enrolled in the Native Village of Minto after Stearman submitted a tribal enrollment application on her behalf.

**B.      The Minto Tribal Court Took Emergency Custody Of S.P.**

S.P. was born in December 2007 in Fairbanks. S.P.'s mother, Bessie Stearman, has a history of substance abuse and arrests, and her three older children, S.P.'s half-siblings, were in Minto Tribal Court custody prior to S.P.'s birth. On December 7, 2007, Mishal Gaede, a tribal social worker in the Child Protection Services Department of the Tanana Chiefs Conference,[3] received a phone call from a screener from the Office of Children's Services (OCS) asking her if she would be willing to meet an OCS staff member and Stearman at Fairbanks Memorial Hospital to develop a safety plan for S.P. Gaede, who had previously contacted the Minto Tribal Court regarding Stearman's pregnancy, agreed to meet with the OCS staff member and Stearman. During the meeting, Gaede informed Stearman of the Minto Tribal Court's concern about S.P.'s safety given Stearman's history and the domestic violence history of Edward Parks, S.P.'s presumed father.

On May 30, 2008, Stearman contacted Rozella Simmonds and asked if she and her husband, Jeff Simmonds, would care for S.P., then six months old, while Stearman was incarcerated for violating probation. Jeff Simmonds is Stearman's first cousin and is eligible for enrollment in the Native Village of Minto. The Simmondses agreed, and Rozella informed Gaede of the arrangement.

On June 2, 2008, Gaede informed the Minto Tribal Court of the situation via teleconference, and the tribal court took emergency temporary legal custody of S.P.,

---

[3]      The Tanana Chiefs Conference is a tribal consortium of Alaska Native Villages in Interior Alaska, including the Native Village of Minto. TANANA CHIEFS CONFERENCE, http://tananachiefs.org (last visited July 14, 2014).

made her a ward of the court, and temporarily granted physical custody to the Simmondses. Parks and Stearman were granted supervised visits with S.P. at the Tanana Chiefs Conference office in Fairbanks.

Parks was working on the North Slope and was not contacted prior to the June 2, 2008 emergency hearing. The day after the hearing, Gaede spoke with Parks and mailed the emergency custody order to Parks's employer in Prudhoe Bay. On June 6 Parks called Gaede to ask for his daughter back; Gaede informed him that she was in the Simmondses' custody and that he could petition the tribal court for an earlier hearing or to arrange visitation with S.P. Parks called back later that day and indicated that he and Stearman were "okay" with S.P. being with the Simmondses for the time being.

C. **Parks Was Notified Of The Minto Tribal Court's Second Hearing On Custody Of S.P., But He Did Not Attend.**

The Minto Tribal Court held another hearing regarding temporary custody of S.P. on July 9, 2008. Stearman, Rozella Simmonds, Gaede, and Evelyn Parks, Edward Parks's mother, were present via teleconference. The tribal court records from this hearing indicate that Stearman was given written notice of the hearing, was present at the hearing, and testified about her incarceration and rehabilitation efforts. Edward Parks was also given written notice of the hearing, but he was not present. The tribal court's contemporaneous notes indicate that Parks was sick and "home in bed." His mother, Evelyn, did address the tribal court, asking that S.P. be placed in her custody while Stearman was incarcerated; she also stated that Edward Parks had supported S.P. and questioned why she had not been contacted to take S.P. The tribal court informed her that she needed to complete a foster care application and a home safety check prior to placement, per tribal foster care policy and federal regulations; she was given an application. The notes also indicated that the tribal court would notify Stevens Village as a courtesy.

The Minto Tribal Court's order reiterated the court's jurisdiction over S.P. The tribal court found that Parks's residence in Fairbanks was unsuitable for an infant; that it was in S.P.'s best interests for the tribal court to continue temporary legal custody; and that it was in her best interests for the Simmondses to continue temporary physical custody. The tribal court required that Stearman continue with her rehabilitation efforts and that Parks obtain an anger management assessment, follow its recommendations, and prepare safe, suitable housing for an infant.

**D.      The Minto Tribal Court Held Its Third Hearing. Parks Attended, Participated, And May Have Objected To The Court's Jurisdiction.**

The Minto Tribal Court held a hearing on temporary custody of S.P. on August 28, 2008, in which Parks participated telephonically after receiving written notice. Parks stated that he wanted his daughter back; the tribal court's order stated that while Parks agreed with the current foster placement, he thought S.P. could be cared for just as properly by his relatives in Anchorage. He also testified about a recent incident with the Fairbanks police and about an arrest warrant for a January 2008 domestic violence incident with Stearman. The tribal court issued an order continuing the temporary custody arrangements and repeating its requirement that Parks obtain and follow the recommendations of an anger management assessment, prepare a suitable home, and complete parenting classes.

Parks claims that he "told the members of the Minto Tribal Court that the Minto Tribal Court had no legal authority to involve itself in matters relating to the custody of S.P." There is no mention of this objection to the tribal court's authority in the court's hearing notes.

After the August hearing, Parks maintained contact with Gaede, who offered to help him write letters to Stevens Village and to the Minto Tribal Court requesting help in paying for an anger management assessment. Gaede also gave Parks

a petition to ask the tribal court to modify its requirements. Later, Parks's regular visitation with S.P. was suspended by a temporary protective order issued by the tribal court after Parks exhibited angry and aggressive behavior with Gaede.

**E.   Parks Filed A Petition With The Minto Tribal Court To Expedite The Custody Case. The Court Held Its Fourth And Fifth Hearings. Parks Attended, Participated, And Clearly Objected To The Court's Jurisdiction.**

On November 4, 2008, Parks filed a petition with the Minto Tribal Court to resume regular visitation with S.P. and to expedite the custody case "as soon as reasonably possible." On December 8, 2008, the tribal court held another temporary custody hearing. Parks was given written notice of the hearing and participated telephonically. Stearman was provided with notice of the hearing but did not participate due to her incarceration. Parks's mother, Evelyn, and a Stevens Village social worker also participated. Parks asked that S.P. be returned to his custody; he testified about his work and living situation, his relationship with S.P., the possibility of living with S.P. in his sister's home in Anchorage, and anger management classes. The Stevens Village social worker reported that she had done a home visit at Parks's sister's house and found it acceptable; she also asked about the barriers to returning S.P. to Parks's custody. The tribal court concluded that the temporary custody arrangement should continue; the order provided for parental visitation and reiterated the court's reunification requirements, including the requirement that Parks complete an anger management program.

At the hearing, Parks objected to the Minto Tribal Court's jurisdiction, stating, "I don't agree w[ith] your jurisdiction over me." It appears that the tribal court responded by advising Parks to hire a lawyer to apply for an order to show cause.

The tribal court held another hearing on March 25, 2009, in which Parks participated. Parks again testified and indicated that he could no longer afford the anger management program he had begun. The tribal court continued the temporary custody

arrangement and reminded Parks that the tribal court required him to attend and complete an anger management program and parenting classes in order to be reunified with S.P. When Parks called the next day, Gaede instructed him to write to the tribal court to request help in paying for the program; Parks did not request help from the court.

F. **Parks Retained An Attorney, Who Sent A Letter To The Minto Tribal Court Clerk In Which He Objected To The Minto Tribal Court's Jurisdiction**.

Parks retained attorney Donald Mitchell to represent him in his attempts to regain custody of S.P. On April 16, 2009, Mitchell faxed a letter on Parks's behalf to Michael Walleri, the general counsel of the Tanana Chiefs Conference, in which Mitchell objected to the Minto Tribal Court's jurisdiction:

> [I]t is my long-held view that neither the Athabascan residents of the Native Village of Minto nor the Alaska Native residents of any other community that Congress designated as a "Native village" for the purposes of the Alaska Native Claims Settlement Act are members of a "federally recognized tribe" that possesses governmental authority of any kind, including jurisdiction to involve itself in child custody matters.
>
> . . . .
>
> [P]lease be advised that if [the Tanana Chiefs Conference] does not arrange for Mr. Parks to be reunited with his daughter I will file a civil action in the U.S. District Court against the Native Village of Minto, [the Tanana Chiefs Conference], Jeffrey and Rozella Simmonds, and — if it turns out that it participated with [the Tanana Chiefs Conference] in placing [S.P.] in the clutches of the Tribal Court for the Native Village of Minto — the Office of Children's Services. That action will seek declaratory and injunctive relief and money damages and it will decide once and for all whether, in Alaska, Tribal Courts are the ersatz institutions that I and many others believe them to be.

Mitchell also sent this letter to Lori Baker, who serves as the Chief of the Native Village of Minto and the Clerk of the Minto Tribal Court.

**G.    Parks And Stearman Removed S.P. From Her Foster Home On The Advice Of Mitchell.  S.P. Was Returned Under Police Escort.**

On May 5, 2009, Parks and Stearman went to the Simmondses home while Jeff and Rozella were out and removed S.P., leaving another letter written by Mitchell. Rozella Simmonds informed Gaede, who contacted the Fairbanks police and reported that a foster child in Minto Tribal Court custody had been abducted.  A police officer stopped the car in which Parks and Stearman were transporting S.P.  Parks returned to the Fairbanks police station with a police escort, and S.P. was returned to the Simmondses.

Parks and Stearman took S.P. from the Simmondses' home on the advice of Mitchell.  Mitchell's second letter, which was left at the Simmondses' home, was dated May 4, 2009, and copied to Walleri, Gaede, OCS, and the Fairbanks Police Department.  In the letter, Mitchell wrote:

> [T]he Minto Tribal Court has no legal jurisdiction of any kind to invent its own child custody proceedings.  And it particularly has no jurisdiction of any kind to involve itself in matters relating to the custody of [S.P.].
>
> . . . .
>
> For that reason, please be further advised that I have advised Mr. Parks and Ms. Stearman that they have the parental rights that the Alaska statutes grant to them to have physical custody of their daughter . . . .  Acting on that advice, they have taken physical custody of [S.P.] . . . .

**H.    The Minto Tribal Court Held A Parental Rights Termination Hearing. Parks Was Represented By Mitchell At The Hearing, But Mitchell Was Not Permitted To Directly Address The Court. The Court Terminated The Parental Rights Of Parks And Stearman.**

On May 7, 2009, the Minto Tribal Court held a hearing on termination of the parental rights of Parks and Stearman. Both Parks and Stearman received notice of the hearing and attended via teleconference from Fairbanks. Parks's attorney, Mitchell, also attended.

Before the hearing, a Tanana Chiefs Conference staff member informed Parks that the tribal court would not permit his attorney to directly address the tribal court; only the parties, their witnesses, or lay advocates were permitted to address the tribal court.

Parks acknowledges receiving this information, and he did not object to this restriction on his attorney's participation during the May 7 hearing. He also did not object to the tribal court's jurisdiction at this hearing.

At the May 7 hearing, Parks and Stearman testified on their own behalf, and Evelyn Parks and the Stevens Village social worker also testified on behalf of Parks. Mitchell was present at the hearing and permitted to speak with Parks and Stearman, but he was not permitted to speak directly to the tribal court.

The tribal court's May 7 order noted that Parks had failed to complete an anger management program, which was a requirement for reunification, and that Parks continued to be a threat to tribal staff and to the Simmondses, which had resulted in multiple tribal court protective orders against him. The tribal court concluded that "[b]y clear and convincing evidence, it is in the best interest of [S.P.] to terminate the parental rights of [Stearman and Parks] due to failure to provide a suitable home and support for [S.P.] and the volatile nature of [Parks]." A subsequent tribal court order granted permanent custody of S.P. to the Simmondses.

**I.      The Notice Given To Parks Prior To The May 7 Hearing Is Disputed.**

The parties dispute whether Parks and Stearman were notified of the Minto Tribal Court's limitation on attorney participation prior to the May 7 hearing.  It is undisputed that by the time of that hearing, Parks had been given written notice of four previous hearings conducted by the tribal court and personally participated in three of them.  He had also presented at least one oral objection to the tribal court's jurisdiction over him, and his attorney had submitted a letter which detailed his jurisdictional objections to the Minto Tribal Court Clerk.

The Minto Tribal Court's written Notice of Hearing informs litigants that "YOU HAVE THE RIGHT TO PRESENT WITNESSES, PRESENT YOUR SIDE OF THE CASE, AND TO QUESTION ANY WITNESSES.  Any paperwork or evidence you wish the court to consider in the hearing may be sent to the [Minto Tribal Court] address."  Parks also received verbal notice of the hearings.

In a sworn declaration, Lori Baker, the Minto Tribal Court Clerk, detailed the court's general notice procedures and the particular notice given to Parks:

> 8.      According to our ordinances, we are permitted to give verbal notice of hearings.  When I do this, I tell the parties that they can bring their attorneys to the court, that they can bring papers or evidence or send them in advance, that the attorneys can talk to their clients in the court, but that the Court itself may not allow the attorneys to speak to the court.
>
> 9.      I worked on the case with Mr. Parks and I have specific memories of providing him with verbal notice of hearings on several occasions.  I told him the same things that I always tell parties that I described in the paragraph above.

Baker's declaration also discussed the rationale underlying the tribal court's policy that permits attorneys to be present at hearings and to advise their clients but not to speak directly to the judges:

-11-                                          6926

First, this is our tradition, our way of solving disputes, and we have always done things this way. Our judges solve problems by speaking directly to the people involved. Second, professional attorneys have an approach that is aggressive and confrontational and is not appropriate for our court; we do not permit our judges to be spoken to in this way. Third, our judges are elders or other respected people in the Tribe, but none of them are trained lawyers so they do not understand legal terminology. Instead, our judges implement traditional law and make decisions based on our laws and values.

Gaede, who participated in all of the tribal court hearings regarding S.P., further commented on the tribal court's policy: "Lawyers are allowed to sit in on the hearings and to talk to their clients and to write notes to them during the hearings. The only restriction I have seen on the lawyers in this region is that tribal courts may not allow them to speak directly to the judges."

J.    **Parks Received Information On Appealing To The Minto Court Of Appeals. Parks Did Not File An Appeal.**

Shortly after the termination of his parental rights, Parks requested information on written Minto law regarding the tribal court and parental rights. He was sent the applicable Minto Tribal Court judicial code, information on the Minto Court of Appeals, and a blank appellate petition form.

The current Minto Judicial Code (dated July 22, 2010) details the tribal court appellate process and provides that "[t]he purpose of the Minto Court of Appeals is not to re-hear cases, but to review cases for possible inconsistent application of tribal law and/or violations of fundamental fairness." An earlier version of the judicial code was provided to Parks in 2009. Parks does not dispute receiving the blank appellate petition form and information on the Minto Court of Appeals.

The information sent to Parks provided instructions on how to file an appeal with the Minto Court of Appeals, including the instruction to file a "brief statement of why the Appellant believes that the Order deserves a hearing by the Minto Court of Appeals."[4] (Emphasis omitted.) There were no page limits or substantive restrictions placed on the appellant's statement of appeal, and there was no restriction on the participation of an attorney in preparing the statement of appeal.

Parks did not file an appeal with the Minto Court of Appeals.

## K. Parks Brought Suit In Federal District Court And Alaska Superior Court To Regain Custody Of S.P. The Federal Case Was Dismissed.

On May 12, 2009, five days after the termination of his parental rights, Parks, represented by Mitchell, filed a declaratory judgment action in the U.S. District Court for the District of Alaska. The gravamen of Parks's federal complaint was that the Native Village of Minto is not a federally recognized tribe, despite explicit recognition as such by the federal government, and that it therefore did not have authority to establish a tribal court or involve itself in child custody matters.

On September 17, 2009, Parks also filed a complaint with the Alaska Superior Court in Fairbanks requesting physical custody of S.P.

The federal district court concluded that the Native Village of Minto is a federally recognized tribe and "that the Native Village of Minto and the State of Alaska have concurrent jurisdiction as to child custody matters such as are raised in the tribal and state court proceedings."[5] The federal district court concluded that abstention

---

[4] The Minto Judicial Code was revised and the 2010 version stated that "[t]he Notice of Appeal shall contain a statement of why the Appellant believes that the case should come before the Minto Court of Appeals."

[5] *S.P. ex rel. Parks v. Native Village of Minto*, No. 3:09-CV-0092 HRH, 2009 WL 9124375, at *7 (D. Alaska Dec. 2, 2009).

-13-                                                                 6926

principles applied and dismissed Parks's federal complaint with prejudice.[6] Parks appealed this dismissal to the U.S. Court of Appeals for the Ninth Circuit, where the dismissal was affirmed.[7]

> **L.  The Native Village Of Minto And The Minto Tribal Court Moved To Dismiss The Superior Court Case. The Superior Court Denied The Motion To Dismiss, Concluding That The Minto Tribal Court's Judgment Was Not Entitled To Full Faith And Credit Because Parks Had Been Denied Minimum Due Process When His Attorney Was Not Permitted To Directly Address The Tribal Court.**

In the state superior court proceeding, the Native Village of Minto and the Minto Tribal Court moved that "[f]ull faith and credit and/or comity should be given to the Orders of the Minto Tribal Court" under the Indian Child Welfare Act (ICWA)[8] and that Parks's complaint should be dismissed with prejudice. In his opposition to the motion to dismiss, Parks, represented by Mitchell, repeated his argument that the Native Village of Minto is not a federally recognized tribe and that the superior court should disregard precedent to the contrary from the U.S. District Court, the Ninth Circuit, and the Alaska Supreme Court.

The superior court denied the motion to dismiss. The superior court commented that "Parks'[s] jurisdictional objections to the exercise of tribal authority in this case are complex, esoteric, rooted in a complicated history and well beyond the ken of most lay people or lay advocates to understand or explain." The superior court concluded that "[w]hen Parks'[s] attorney was prohibited from speaking at the outset of the termination trial, Parks was denied a meaningful opportunity to present his

---

[6]  *Id.* at *7-8.

[7]  *S.P. ex. rel. Parks v. Native Village of Minto*, 443 F. App'x 264, 266 (9th Cir. 2011).

[8]  25 U.S.C. §§ 1901-1963 (2012).

jurisdictional objections to the exercise of Minto's tribal authority. Therefore, he was denied minimum due process under the U.S. and Alaska Constitutions." The superior court concluded that because of this due process violation, full faith and credit could not be afforded to the Minto Tribal Court's order terminating Parks's parental rights.

**M. The Simmondses Petitioned This Court To Review The Superior Court's Denial Of Their Motion To Dismiss. We Granted The Petition And Remanded To The Superior Court.**

The Simmondses, now represented by the Native American Rights Fund, filed a petition for review by this court, asking us to review the superior court's due process and full faith and credit conclusions. We granted the petition and remanded the case to the superior court to develop the evidentiary record and to make findings and conclusions on a number of specific questions regarding the tribal court proceedings, including whether Parks was given an opportunity to make his jurisdictional arguments on his own or in writing; why Parks was not allowed oral argument by counsel and whether that denial amounted to a due process violation; whether the proceedings were recorded, and if not, why not; and whether any possible due process violations could be characterized as harmless error, particularly in light of our decision in *State v. Native Village of Tanana*,[9] which addressed certain aspects of tribal court jurisdiction and the possible application of full faith and credit under ICWA.

**N. On Remand The Superior Court Concluded That Parks Had Been Denied Minimum Due Process And That The Denial Could Not Be Considered Harmless Error Because It Was An Open Question Whether The Minto Tribal Court Had Jurisdiction Over Parks As A Nonmember.**

No party requested an evidentiary hearing on remand. The parties submitted supplemental briefing, and the superior court held oral argument. The superior

---

[9] 249 P.3d 734 (Alaska 2011).

court again refused to dismiss the case and concluded that the Minto Tribal Court's judgment was not entitled to full faith and credit under ICWA because Parks "was denied a meaningful opportunity to be heard on his jurisdictional challenges."

The superior court concluded that "an essential element of due process [is] the right to be meaningfully represented by counsel at all stages of the [parental rights termination] proceedings, at least where the parties retain counsel" and that "Parks'[s] attorney was not given an opportunity to speak (orally or in writing) for Parks at any stage of the proceedings." The superior court found that Parks's attorney was not permitted oral argument at the May 7 termination hearing; the superior court also found that although Parks's attorney was permitted to submit written arguments to the tribal court, there were factual disputes as to whether Parks had notice of this right and whether the tribal court ever received Parks's attorney's April 16 letter, which had been submitted to the tribal court clerk. The superior court found that the tribal court's written notices of hearing were "deficient in that they do not advise litigants that lawyers will not be permitted to speak to tribal judges. More importantly, the written notices do not state that legal arguments may only be presented in writing." The superior court's finding that Parks's attorney was not given an opportunity to submit written argumentation was key to its denial of full faith and credit because the superior court also concluded that "[m]inimal due process does not require the opportunity for oral argument."

The superior court also addressed the issue whether any due process violations were harmless beyond a reasonable doubt if Parks's jurisdictional arguments lacked merit. The superior court concluded that Parks's argument that the Native Village of Minto is not a federally recognized tribe, which was the primary basis for Parks's jurisdictional objection throughout the multiple litigations, was definitively rejected in

*John v. Baker* (*John I*),[10] *In re C.R.H.*,[11] and, most recently, *McCrary v. Ivanoff Bay Village*.[12] Similarly, the superior court concluded that Parks's argument that Alaska tribes were entirely without authority to initiate ICWA-defined child protection proceedings outside of Indian Country was definitively rejected by this court in *State v. Native Village of Tanana*.[13]

But the superior court concluded that "the due process violations were not harmless beyond a reasonable doubt on the still-undecided issues of: (1) the scope of tribal inherent authority to initiate ICWA-defined parental rights termination action against a nonmember parent, (2) whether parents may object to tribal court jurisdiction in such cases[,] and (3) whether Parks had minimum contacts with the tribe."[14] The superior court's decision included an extensive discussion of the subject matter jurisdiction of tribal courts based on its interpretation of the United States Supreme Court's decision in *Montana v. United States*.[15] The superior court concluded that "there is arguably an open question after *John v. Baker* concerning whether a child's tribal membership (or eligibility for membership) is, standing alone, a *sufficient* basis for jurisdiction where one of the parents is a non-consenting nonmember of the tribe." (Emphasis in original.) The superior court therefore concluded that "[i]t was not harmless error beyond a reasonable doubt for the Minto Tribal Court to have failed to

---

[10] 982 P.2d 738, 749-50 (Alaska 1999).

[11] 29 P.3d 849, 851 n.5 (Alaska 2001).

[12] 265 P.3d 337, 339-42 (Alaska 2011).

[13] 249 P.3d at 750-52.

[14] *Cf. id.* at 751-52 (expressly leaving these questions open for later consideration).

[15] 450 U.S. 544 (1981).

provide a meaningful opportunity for Parks to challenge Minto's jurisdiction over him based on his lack of membership in the tribe."

**O.    The Simmondses Brought A Second Petition To Review The Superior Court's Minimum Due Process And Jurisdictional Conclusions.  We Granted The Petition.**

The Simmondses brought a second petition for review, asking this court to reverse the superior court's refusal to give full faith and credit to the Minto Tribal Court's judgment and dismiss Parks's state court suit; in particular, the Simmondses asked this court to reverse the superior court's conclusions on due process and tribal court jurisdiction.  The State of Alaska intervened in support of review and in support of affirming the superior court's order.  We granted the second petition on the following questions:

(1)    Did the Minto Tribal Court have subject matter jurisdiction to terminate Parks's parental rights?

(2)    Did the Minto Tribal Court have personal jurisdiction over Parks and S.P.?  Did Parks consent to the jurisdiction of the Minto Tribal Court?  Did Parks as a non-[tribal member] parent have the right to transfer his case from the Minto Tribal Court to state court?

(3)     Did the Minto Tribal Court provide Parks with a meaningful opportunity to present his case when it refused to let his attorney speak for him in the tribal court?

(4)    Did the Minto Tribal Court provide Parks with adequate notice that his attorney would only be able to make arguments by submitting them in writing beforehand?

(5)    If Parks was denied a meaningful opportunity to be heard in the tribal court, was the denial prejudicial if the Minto Tribal Court had jurisdiction?

(6)    What effect, if any, does Parks's failure to exhaust his remedies by appealing in the tribal court have on his due process claim?

(7)     Was the issue of jurisdiction fully and fairly litigated in the Minto Tribal Court?

(8)     If the tribal court order is not entitled to full faith and credit, what is the appropriate remedy?  If the tribal court order is vacated, should the instant action be converted to a [Child-in-Need-of-Aid] proceeding, remanded to the Minto Tribal Court for further proceedings, or remanded to the superior court?

Parks and Stearman are Respondents to the petition, and the State of Alaska is Intervenor-Respondent.[16]  A number of Alaska Native Villages collectively have submitted an amicus curiae brief in support of the Petitioners' position that this court should reverse the superior court and order dismissal of the state court action.

## III.   STANDARDS OF REVIEW

This case involves questions of both fact and law.  "We review factual findings for clear error, and will uphold the superior court's findings unless we are left with a definite and firm conviction on the entire record that a mistake has been made, even though there may be evidence to support the finding."[17]  "We evaluate de novo the

---

[16]     Bessie Stearman was not a party to the original complaint for custody of a minor child brought by Parks in the superior court.  At various later stages in the superior court proceedings, she has been listed both as a defendant and as a plaintiff.  Stearman did not file a response when the Simmondses petitioned this court to review the superior court's decision on remand, but she did submit briefing and participate in oral argument before us.  Stearman adopts and relies on the State's and Parks's arguments on the questions presented in this petition.

Like Parks, Stearman failed to appeal the termination of her parental rights to the Minto Court of Appeals.  Therefore, our decision — that because Parks failed to exhaust available tribal court appellate remedies, he is not permitted to relitigate his minimum due process and jurisdictional claims in state court — applies equally to Stearman.

[17]     *John v. Baker* (*John II*), 30 P.3d 68, 71 (Alaska 2001) (quotation marks (continued...)

scope of tribal jurisdiction and the meaning of federal statutes."[18] "Under de novo review, we apply 'the rule of law that is most persuasive in light of precedent, reason, and policy.' "[19] "When construing statutes that affect the rights of Native Americans, we liberally construe these statutes and resolve ambiguities in favor of Native Americans."[20]

## IV. DISCUSSION

### A. Overview

This petition comes before us after the superior court on remand refused to dismiss Parks's state court action, concluding that the Minto Tribal Court's judgment terminating Parks's parental rights was not entitled to full faith and credit under ICWA's § 1911(d)[21] because the tribal court violated minimum due process. The superior court based its decision on its conclusion that Parks suffered "the *complete* denial of an opportunity to be meaningfully heard on the jurisdictional challenges raised in this case."

---

[17](...continued)
omitted).

[18]     *Tanana*, 249 P.3d at 737 (citing *John I*, 982 P.2d 738, 744 (Alaska 1999)).

[19]     *Id*. (citation omitted).

[20]     *Starr v. George*, 175 P.3d 50, 54 (Alaska 2008) (citing *John I*, 982 P.2d at 752 (citing *Bryan v. Itasca Cnty.*, 426 U.S. 373, 392 (1976))).

[21]     25 U.S.C. § 1911(d) (2012) provides:

The United States, every State, every territory or possession of the United States, and every Indian tribe shall give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the public acts, records, and judicial proceedings of any other entity.

(Emphasis in original.) This conclusion was based on factual findings regarding the notice given Parks regarding attorney participation.

Any consideration of a tribal court's judgment in an ICWA-defined child custody proceeding must begin with "the established principle under federal law that 'Indian tribes retain those fundamental attributes of sovereignty . . . which have not been divested by Congress or by necessary implication of the tribe's dependent status' "[22] and Congress's express finding in ICWA that "there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children."[23] Through ICWA's full faith and credit clause, Congress mandates that states respect a tribe's vital and sovereign interests in its children. This requires that we give the same respect to tribal court judgments that we give to judgments from a sister state.[24] As a measure of that respect, we have refused to allow a party to collaterally attack a sister state's judgment when the party failed to appeal in that state's courts.[25] Looking to federal law to interpret ICWA's full faith and credit mandate,[26] we find persuasive the policies

---

[22] *John I*, 982 P.2d at 751 (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 146 (1982)) (omission in original).

[23] 25 U.S.C. § 1901(3).

[24] 25 U.S.C. § 1911(d) ("[E]very State . . . shall give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that [it] give[s] full faith and credit to the public acts, records, and judicial proceedings of any other [State]."); *Starr*, 175 P.3d at 55.

[25] *Wall v. Stinson*, 983 P.2d 736, 741 (Alaska 1999) ("The remedy for legal error is appeal, not collateral attack.").

[26] *Starr*, 175 P.3d at 57 ("ICWA requires the state to give the same credit to tribal court judgments it gives to the judgments of the courts of sister states. We

(continued...)

underlying the federal doctrine of exhaustion of tribal remedies,[27] and we adopt that doctrine in this context. Unless one of the exceptions to the exhaustion doctrine discussed below applies,[28] we will not allow a party to challenge a tribal court's judgment in an ICWA-defined child custody proceeding in Alaska state court without first exhausting available tribal court appellate remedies. Because Parks failed to exhaust available tribal court remedies by appealing to the Minto Court of Appeals, and because none of the exceptions to the exhaustion doctrine apply, we conclude that he is not permitted to relitigate his minimum due process and jurisdictional claims in Alaska state court. Therefore, we accord full faith and credit to the Minto Tribal Court's judgment terminating Parks's parental rights, and we reverse, remanding to the superior court to order dismissal of Parks's state court action.

---

[26](...continued)
therefore look to the federal Full Faith and Credit Clause and the implementing federal statute, which require the state to give full faith and credit to the judgments of the courts of sister states, for guidance in determining whether the tribal court resolutions meet the requirements entitling them to full faith and credit under ICWA." (citations omitted)).

[27]     *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856 (1985) ("Our cases have often recognized that Congress is committed to a policy of supporting tribal self-government and self-determination. That policy favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge." (citations omitted)).

[28]     *Id.* at 856 n.21; *Strate v. A-1 Contractors*, 520 U.S. 438, 459 n.14 (1997).

**B.  Recognition Of The Minto Tribal Court's Judgment On The Custody Of S.P. Implicates Interests At The Core Of Tribal Sovereignty And Self-Determination.**

In *John I*,[29] which we recently relied on as the "foundational Alaska authority regarding Alaska Native tribal jurisdiction over the welfare of Indian children,"[30] we made clear that when determining the question of tribal jurisdiction over the welfare of tribal children, our twin interpretive lodestars are the tribe's retained inherent sovereign powers and congressional intent to limit or modify those retained inherent powers.[31]  We "follow federal law by beginning from the premise that tribal sovereignty with respect to issues of tribal self-governance exists unless divested,"[32] and "we will not lightly find that Congress intended to eliminate the sovereign powers of Alaska tribes."[33]

The welfare of tribal children is of vital and fundamental importance to tribal self-governance, and ICWA was enacted in "recogni[tion] that a tribe has a strong interest in 'preserving and protecting the Indian family as the wellspring of its own future.' "[34]  In its statutory findings in ICWA, Congress made explicit its "responsibility for the protection and preservation of Indian tribes" and its intent to protect tribal self-

---

[29]    982 P.2d 738 (Alaska 1999).

[30]    *State v. Native Village of Tanana*, 249 P.3d 734, 750 (Alaska 2011) (internal quotation marks omitted).

[31]    *John I*, 982 P.2d at 751.

[32]    *Id.* at 752.

[33]    *Tanana*, 249 P.3d at 750 (quoting *John I*, 982 P.2d at 752-53 (internal quotation marks omitted)).

[34]    *John I*, 982 P.2d at 752 (quoting H.R. REP. NO. 95-1386, at 19 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7541).

determination over Indian child custody proceedings: "[T]here is no resource that is more vital to the continued existence and integrity of Indian tribes than their children and . . . the United States has a direct interest, as trustee, in protecting Indian children who are members of or are eligible for membership in an Indian tribe."[35]

The tribal sovereignty to decide cases involving the best interests of tribal children recognized in *John I* is inherent, non-territorial sovereignty.[36] *Native Village of Tanana* recognized that this inherent sovereignty included the right to initiate child custody proceedings, including those defined in ICWA for which judgments must be afforded full faith and credit by states.[37] In *John I* and *Native Village of Tanana*, we articulated our understanding that " 'Congress's purpose in enacting ICWA reveals its intent that Alaska Native villages retain their power to adjudicate child custody disputes' and 'ICWA's very structure presumes both that the tribes . . . are capable of adjudicating child custody matters . . . and that tribal justice systems are appropriate forums for resolution of child custody disputes.' "[38] "ICWA creates limitations on states' jurisdiction over ICWA-defined child custody proceedings"[39] through the jurisdictional provisions which lie "[a]t the heart of the ICWA."[40] Section 1911 defines "Indian tribe jurisdiction over Indian child custody proceedings," including exclusive tribal jurisdiction, transfer jurisdiction, and the right of the child's tribe to intervene in state

---

[35]   25 U.S.C. § 1901 (2012).

[36]   *John I*, 982 P.2d at 748-49.

[37]   *Tanana*, 249 P.3d at 751.

[38]   *Id.* at 750 (quoting *John I*, 982 P.2d at 753-54) (omissions in original).

[39]   *Id.*

[40]   *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36 (1989).

court proceedings.[41]  But Congress foresaw that § 1911's limitations on states' jurisdiction might prove to be hollow if states, which had "often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families,"[42] were free to disregard tribal court judgments in child custody proceedings.  Congress therefore included § 1911(d), which requires that states give full faith and credit to tribal court child custody judgments to the same extent as states give full faith and credit to the judgments of sister states,[43] as prescribed by the U.S. Constitution[44] and federal law.[45]  This full faith and credit mandate provides a statutory guarantee that a tribe's vital sovereign interests in the welfare of its children will be respected by state courts.[46]

---

[41]      25 U.S.C. § 1911(a)-(c).

[42]      25 U.S.C. § 1901(5).

[43]      25 U.S.C. § 1911(d).

[44]      U.S. CONST. art. IV, § 1.

[45]      28 U.S.C. § 1738 (2012) ("[J]udicial proceedings . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.").  Congress enacted § 1738 to implement the Full Faith and Credit Clause of the U.S. Constitution. *Magnolia Petroleum Co. v. Hunt*, 320 U.S. 430, 437-38 (1943); *see also Starr v. George*, 175 P.3d 50, 57 (Alaska 2008) (indicating that we look to federal law to interpret ICWA's full faith and credit clause).

[46]      *See State v. Native Village of Tanana*, 249 P.3d 734, 751 (Alaska 2011) ("Necessarily, federally recognized Alaska Native tribes are entitled to all of the rights and privileges of Indian tribes under ICWA, including procedural safeguards imposed on states and § 1911(d) full faith and credit with respect to ICWA-defined child custody orders to the same extent as other states and foreign orders." (citation omitted)).

In light of this conclusion, as well as the well-established canon that "[c]ourts must resolve ambiguities in statutes affecting the rights of Native Americans in favor of Native Americans,"[47] we turn to ICWA's full faith and credit clause and its application to the Minto Tribal Court's judgment terminating Parks's parental rights.

**C.    ICWA's Full Faith And Credit Clause Mandates That We Give The Same Respect To Tribal Court Judgments In Child Custody Proceedings That We Give To Judgments From A Sister State.**

ICWA § 1911(d) requires that state courts give full faith and credit to the judgments of tribal courts in Indian child custody proceedings to the same extent that they give full faith and credit to the judgments of other states.[48]    Therefore, we first ascertain whether ICWA § 1911(d) applies to the judgment of the Minto Tribal Court terminating Parks's parental rights before turning to the requirements of full faith and credit.

---

[47]    *John I*, 982 P.2d 738, 752 (Alaska 1999); *see also South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329. 348 (1998) (recognizing "the standard canon of Indian law" that "federal action which might arguably abridge [powers of tribal self-government] is construed narrowly in favor of retaining Indian rights" (internal quotation marks omitted)); *Bryan v. Itasca Cnty.*, 426 U.S. 373, 392 (1976) ("[W]e must be guided by that eminently sound and vital canon . . . that statutes passed for the benefit of dependent Indian tribes are to be liberally construed, doubtful expressions being resolved in favor of the Indians." (ellipsis, citation, and internal quotation marks omitted)).

[48]    25 U.S.C. § 1911(d).

1. **The Minto Tribal Court's proceedings satisfy ICWA's definition of child custody proceedings and therefore ICWA's full faith and credit mandate applies to its judgments.**

It is undisputed that S.P. is an Indian child for ICWA purposes.[49] S.P. was eligible for membership in the Native Village of Minto under its tribal law, and she was formally enrolled in November 2008 after Stearman submitted a tribal enrollment application on her behalf.[50] It is also undisputed that the Minto Tribal Court's custody and termination proceedings satisfied ICWA's definition of Indian child custody proceedings.[51] Therefore, ICWA § 1911(d)'s full faith and credit mandate applies to the Minto Tribal Court's order which terminated the parental rights of Parks and Stearman.

At oral argument before us, the State argued that tribal court judgments are entitled to a different, perhaps diluted, form of full faith and credit than sister state judgments because "tribes are differently situated than states." When asked whether its position was that "the full faith and credit that we give to tribal court judgments is a different type of full faith and credit tha[n] we give to our sister sovereign states," the State responded affirmatively, asserting that "[i]n a way it is because of the fact that

---

[49]    See 25 U.S.C. § 1903(4), defining "Indian child" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."

[50]    ICWA § 1903(5) also provides for determining an "Indian child's tribe" when an Indian child may be eligible for membership in more than one tribe.  ICWA gives tribal jurisdiction and intervention rights to "the Indian tribe with which the Indian child has the more significant contacts." 25 U.S.C. § 1903(5).  While S.P. may have also been eligible for membership in Stevens Village based on Parks's membership, the parties do not dispute Minto Village's status as S.P.'s tribe for purposes of ICWA.

[51]    See 25 U.S.C. § 1903(1), defining "child custody proceeding" to include foster care placement, termination of parental rights, preadoptive placement, and adoptive placement.

states have the obligation to adhere to the minimum standards of the U.S. Constitution. Tribes have no such obligation to do that." We reject this argument.

The State's argument for a different type of full faith and credit for tribal judgments in ICWA-defined child custody proceedings is clearly foreclosed by the statutory language of § 1911(d), which requires full faith and credit "*to the same extent*" as that given to any other entity including other states.[52] Neither the State nor Parks contests that Congress's grant of full faith and credit to tribal court judgments under ICWA § 1911(d) is a permissible exercise of Congress's plenary powers over Indian affairs. Such a challenge to the statute would have failed in any event given the United States Supreme Court's recognition that "the Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that [the United States Supreme Court] ha[s] consistently described as 'plenary and exclusive,' "[53] including the "authori[ty] . . . to enact legislation that both restricts and . . . relaxes . . . restrictions on tribal sovereign authority."[54]

The State's argument also fails to afford tribal courts the respect to which they are entitled as the judicial institutions of sovereign entities. We have previously

---

[52]     25 U.S.C. § 1911(d) (emphasis added); *see also State v. Native Village of Tanana*, 249 P.3d 734, 751 (Alaska 2011) ("Necessarily, federally recognized Alaska Native tribes are entitled to all of the rights and privileges of Indian tribes under ICWA, including . . . § 1911(d) full faith and credit with respect to ICWA-defined child custody orders to the same extent as other states' and foreign orders." (citation omitted)).

[53]     *United States v. Lara*, 541 U.S. 193, 200 (2004) (citation omitted).

[54]     *Id*. at 202.

emphasized respect for tribal courts,[55] and this respect must inform our analysis, especially when full faith and credit is mandated by Congress.

### 2. We require exhaustion of appellate remedies before allowing collateral attack on sister state judgments. Tribal court judgments in ICWA-defined child custody proceedings are entitled to the same respect.

We will deny full faith and credit to the final judgment of a sister state only in limited circumstances, including situations where (1) the issuing court lacked personal or subject matter jurisdiction when it entered its judgment; or (2) the issuing court failed to render its judgment in accordance with minimum due process.[56] A sister state's judgment is presumed to be entitled to full faith and credit, and the burden of proof is properly on the party challenging the validity of the judgment.[57] The same presumption and burden apply when a party challenges a tribal court judgment that is entitled to full faith and credit. "[I]t is presumed the decisions of tribal courts are sound unless the challenging party can show that the foreign judgment was constitutionally infirm."[58]

---

[55] *See, e.g.*, *John I*, 982 P.2d 738, 762-63 (Alaska 1999) (holding that "as a general rule, our courts should respect tribal court decisions under the comity doctrine," which we defined in terms of "mutual respect").

[56] *See Starr v. George*, 175 P.3d 50, 55 (Alaska 2008).

[57] *See John II*, 30 P.3d 68, 72 (Alaska 2001) (noting that a "presumption against judicial error is common between cooperating courts of concurrent jurisdiction" and that "courts have placed the burden of proof upon the party challenging another state's judgment").

[58] *Starr*, 175 P.3d at 56 (internal quotation marks and citation omitted). This presumption accords with our precedent on granting comity to tribal court judgments in the non-ICWA child custody context. *John II*, 30 P.3d at 72 ("[I]t should be presumed that tribal courts' decisions are sound and deserving of comity unless the challenging party can show otherwise.").

As a measure of respect for our sister states and their courts, we have refused to allow a party to collaterally attack a sister state's judgment when the party failed to appeal in that state's courts. In *Wall v. Stinson*, we "decline[d] to reexamine"[59] challenges to a sister state's judgment, including challenges to the issuing court's jurisdiction, when the party "failed to prosecute an appeal."[60] We concluded that "[e]ven if the judgment is based on legal error, it is entitled to full faith and credit. The remedy for legal error is appeal, not collateral attack."[61]

We have recognized that tribal court judgments in ICWA-defined child custody proceedings are entitled to full faith and credit to the same extent as a judgment of a sister state.[62] Therefore, when a party challenges the validity of a tribal judgment in an ICWA-defined child custody proceeding, we must consider whether tribal appellate remedies were available, and if so, whether the party challenging the judgment "failed to prosecute an appeal."[63]

## D. The Exhaustion Of Tribal Remedies Doctrine Is Persuasive In This Context And We Adopt The Federal Doctrine.

Given our precedent that the failure to exhaust appellate remedies precludes collateral attack,[64] and the necessity of interpreting ICWA in light of relevant federal Indian law, we proceed to examine the federal exhaustion of tribal court remedies

---

[59]     983 P.2d 736, 743 (Alaska 1999).

[60]     *Id.* at 741.

[61]     *Id.*

[62]     *Starr*, 175 P.3d at 55 ("ICWA requires the state to give the same credit to tribal court judgments it gives to the judgments of the courts of sister states.").

[63]     *Wall*, 983 P.2d at 741.

[64]     *Id.*

doctrine. The policies underlying that doctrine are persuasive in this context, and we adopt the federal doctrine.

In *Starr v. George*, we directly addressed ICWA's full faith and credit mandate for tribal court judgments, and we concluded that "[f]ull faith and credit . . . requires that the issuing court afford the parties due process and render its judgment in accordance with federal and state constitutional standards."[65] We relied on federal law for "guidance in determining whether the tribal court resolutions meet the requirements entitling them to full faith and credit under ICWA."[66] Similarly, in answering the question whether Parks was required to exhaust available tribal appellate remedies, we look to federal law for guidance and conclude that the federal exhaustion of tribal remedies doctrine should apply in this case.

This case involves an issue of federal Indian law, namely the Minto Tribal Court's power and jurisdiction to determine custody issues affecting S.P., including termination of the parental rights of her non-tribal member father and her tribal member mother. The Ninth Circuit faced similar fact patterns involving the custody of a tribal member child and the parental rights of a non-tribal member parent in *Boozer v. Wilder*[67] and *Atwood v. Fort Peck Tribal Court Assiniboine*,[68] dismissing both cases for failure to exhaust available tribal court remedies. The *Boozer* court looked to United States Supreme Court precedent and concluded that "[b]ecause federal law defines the outer boundaries of an Indian tribe's power over non-Indians, the question whether an Indian tribe retains the power to compel a non-Indian . . . to submit to the civil jurisdiction of

---

[65]    175 P.3d at 55.

[66]    *Id.* at 57.

[67]    381 F.3d 931 (9th Cir. 2004).

[68]    513 F.3d 943 (9th Cir. 2008).

-31-                                                                          6926

a tribal court is one that must be answered by reference to federal law."[69]  The *Boozer* court further concluded that "[a] federal court must give the tribal court a full opportunity to determine its own jurisdiction, which includes exhausting opportunities for appellate review in tribal courts," and proceeded to apply the exhaustion of tribal remedies doctrine.[70]

The United States Supreme Court announced the exhaustion of tribal remedies doctrine in *National Farmers Union Insurance Companies v. Crow Tribe of Indians*,[71] where the Court concluded that the congressional "policy of supporting tribal self-government and self-determination . . . favors a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge."[72]  The United States Supreme Court has also recognized that "proper respect for tribal legal institutions requires that they be given a 'full opportunity' to consider the issues before them and to rectify any errors."[73]  "Proper respect" for tribal courts requires affording them a "full opportunity" to conduct tribal appellate review:  "The federal policy of promoting tribal self-government encompasses

---

[69]      381 F.3d at 934 (omission in original) (quoting *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 851-52 (1985)) (internal quotation marks omitted); *see also Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 324 (2008) ("We begin by noting that whether a tribal court has adjudicative authority over nonmembers is a federal question.").

[70]      381 F.3d at 935 (citing *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16-17 (1987)).

[71]      471 U.S. 845.

[72]      *Id.* at 856.

[73]      *Iowa Mut. Ins.*, 480 U.S. at 16 (quoting *Nat'l Farmers Union*, 471 U.S. at 857).

the development of the entire tribal court system, including appellate courts. At a minimum, exhaustion of tribal remedies means that tribal appellate courts must have the opportunity to review the determinations of the lower tribal courts."[74]

The United States Supreme Court has explained that the exhaustion of tribal remedies doctrine is " 'prudential,' [rather than] jurisdictional,"[75] so federal courts are instructed to examine relevant federal policy and determine whether "[r]espect for tribal self-government ma[kes] it appropriate 'to give the tribal court a "full opportunity to determine its own jurisdiction." ' "[76] When Congress passed ICWA, it included statutory findings making clear the paramount importance of the welfare of tribal children to the continued viability of tribal self-government and self-determination: "[T]he Congress finds . . . there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children . . . ."[77] As discussed above, there can be no doubt then that the "policy of supporting tribal self-government and self-determination"[78] applies to ICWA-defined tribal child custody proceedings and supports a conclusion that tribal remedies must be exhausted before state jurisdiction may be exercised.

In addition to the doctrine's applicability in federal courts, at least one state supreme court has held that the doctrine is binding on its state's courts in situations of

---

[74]     *Id.* at 16-17.

[75]     *Strate v. A-1 Contractors*, 520 U.S. 438, 451(1997) (quoting *Iowa Mut. Ins.*, 480 U.S. at 20 n.14).

[76]     *Id.* (quoting *Iowa Mut. Ins.*, 480 U.S. at 16).

[77]     25 U.S.C. § 1901(3) (2012).

[78]     *Nat'l Farmers Union*, 471 U.S. at 856.

concurrent tribal and state jurisdiction.[79] As the Connecticut Supreme Court persuasively reasoned,

> [t]he Supreme Court established the doctrine mainly in order to avoid disruption of that "federal policy supporting tribal self-government . . . [through] direct competition [by the federal courts] with the tribal courts . . . ." In our view, direct competition from state courts is equally likely to disrupt that federal policy. Because we owe no less deference to federal, statutory based policy than do the federal courts, we should be no more willing than they to risk disruption of this federal policy by exercising jurisdiction over cases to which the doctrine would apply. Indeed, the well recognized " 'plenary and exclusive [federal] power over Indian affairs' " which generally precludes independent exercise of state authority vis-a-vis tribal affairs, deepens our duty of deference to this particular policy. We conclude, therefore, that the doctrine is binding on the courts of this state.[80]

We have also considered an exhaustion requirement in the context of extending comity to tribal court child custody decisions not covered by ICWA. In *John II*, we gave notice that "a litigant's failure to exhaust tribal remedies is a significant factor to be considered when that litigant challenges comity."[81] We pointed out that the tribal court "had no chance to pursue internal remedies" to rectify the alleged due process violation, which in that case was the loss of the court record.[82] We declined to adopt a strict exhaustion requirement in the comity analysis of a non-ICWA child custody case,

---

[79] *Drumm v. Brown*, 716 A.2d 50, 63-64 (Conn. 1998).

[80] *Id.* (alterations in original) (first omission in original) (citations omitted).

[81] 30 P.3d 68, 74 n.31 (Alaska 2001).

[82] *Id.* at 74.

but we warned that the failure to exhaust tribal appellate procedures could "seriously undermine" a party's claim to have been denied minimum due process.[83]

Here we are not examining the analysis of comity but rather that of full faith and credit required by ICWA. In *Starr v. George*, we noted that full faith and credit requires even greater deference to tribal court judgments than does comity.[84] Under the heightened standard of full faith and credit, a litigant's failure to appeal a tribal court's child custody decision must even more "seriously undermine any claims that the tribal court denied him due process,"[85] thus supporting adoption of the federal exhaustion of tribal remedies doctrine.

The policies underlying the exhaustion of remedies doctrine are persuasive in the context of ICWA-defined child custody proceedings and are consistent with our precedent stating that the failure to exhaust appellate remedies precludes review of sister state judgments. We therefore adopt the federal exhaustion of remedies doctrine in this context and turn next to the question whether Parks satisfied any of the exceptions to that doctrine.

---

[83]    *Id.* at 74 n.31.

[84]    175 P.3d 50, 53 (Alaska 2008) (noting that comity is "a principle under which it is easier to attack the parallel judgments of foreign (in this case, tribal) courts" than it is under the principle of full faith and credit). We also cited Robert Laurence, *The Convergence of Cross-Boundary Enforcement Theories in American Indian Law: An Attempt to Reconcile Full Faith and Credit, Comity and Asymmetry*, 18 QUINNIPIAC L. REV. 115, 125-26 (1998), for the propositions that "once full faith and credit principles are found to apply, the receiving court is very restricted in the kinds of collateral attacks that it is allowed to entertain," and "[c]omity is less restrictive a doctrine than full faith and credit." *Starr*, 175 P.3d at 53 n.10.

[85]    *John II*, 30 P.3d at 74 n.31.

**E.  Parks Has Not Satisfied Any Of The Exceptions To The Exhaustion Of Tribal Remedies Doctrine.**

Federal law recognizes limited exceptions to the exhaustion of tribal remedies doctrine.  Exhaustion is not required "where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith, or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction."[86]  Nor is exhaustion required if it is clear that the tribal court lacks jurisdiction over the dispute so that "the otherwise applicable exhaustion requirement must give way, for it would serve no purpose other than delay."[87]

The State and Parks do not argue that the assertion of the Minto Tribal Court's jurisdiction "[was] motivated by a desire to harass or [was] conducted in bad faith" or that "the action [was] patently violative of express jurisdictional prohibitions."[88]  Instead, the State asserts a futility argument, contending that "appellate review of Parks's jurisdictional objections would not have been meaningful."  The State also argues that if the exhaustion doctrine applies to Parks, then his case falls under the exception where it is "plain" that the tribal court lacked jurisdiction so that "the otherwise applicable exhaustion requirement must give way, for it would serve no purpose other than delay."[89]  Parks agrees with these arguments.  We conclude that Parks has not satisfied any of the

---

[86]   *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856 n.21 (1985) (internal quotation marks and citation omitted).

[87]   *Strate v. A-1 Contractors*, 520 U.S. 438, 459 n.14 (1997) (internal citation omitted); *see also Nevada v. Hicks*, 533 U.S. 353, 369 (2001); *Boozer v. Wilder*, 381 F.3d 931, 935 (9th Cir. 2004).

[88]   *Nat'l Farmers Union*, 471 U.S. at 856 n.21.

[89]   *Strate*, 520 U.S. at 459 n.14 (citation omitted).

exceptions to the exhaustion requirement and that his failure to exhaust available tribal appellate remedies is thus fatal to his state court action.

### 1. Parks chose not to exhaust available tribal appellate remedies.

Shortly after the termination of his parental rights, Parks was provided with detailed information on his right to seek review by the Minto Court of Appeals. Parks received instructions on how to file an appeal, including the instruction to file a "brief statement of why the Appellant believes that the Order deserves a hearing by the Minto Court of Appeals."[90] (Emphasis omitted.) There were no page limitations or substantive restrictions placed on the appellant's statement of appeal, and there were no restrictions on the participation of an attorney in preparing the statement of appeal. Yet Parks failed to file an appeal with the Minto Court of Appeals.

### 2. Parks does not satisfy the futility exception to the exhaustion doctrine.

In *National Farmers Union*, the United States Supreme Court articulated an exception to the exhaustion requirement "where exhaustion would be futile because of the lack of an adequate opportunity to challenge the [tribal] court's jurisdiction."[91]

The superior court, in its first order denying the motion to dismiss, expressed concern that the appellate process of the Minto Court of Appeals might not present an adequate opportunity to challenge the tribal court's jurisdiction, focusing on that court's use of the term "brief statement" in its appellate procedures:

> The Minto appeal procedures permit only a "brief statement"
> of the reasons for the appeal . . . . Given the limited statement
> permitted under the appeal procedures, the rule that lawyers

---

[90]    The Minto Judicial Code was revised and the 2010 version stated that "[t]he Notice of Appeal shall contain a statement of why the Appellant believes that the case should come before the Minto Court of Appeals."

[91]    471 U.S. at 856 n.21.

may not speak before the Minto tribal courts, and the reason given at oral argument for the rule — that Minto Tribal Court judges are not law-trained and therefore do not permit lawyers to speak — requiring exhaustion of tribal remedies would not cure the due process denial that occurred here — the refusal to permit a jurisdictional objection to be raised and heard in a meaningful fashion. . . . [T]herefore, exhaustion of tribal remedies is not required under the circumstances of this case.

But the superior court's concern was misplaced for two reasons. First, there were no specific limitations on the length of submissions to the Minto Court of Appeals or restrictions on the ability of Parks's attorney to prepare submissions and thereby present his jurisdictional objections. We will not presume that the Minto Court of Appeals' procedures precluded meaningful written briefing based on its use of the phrase "brief statement."[92] Second, the futility exception to the federal exhaustion doctrine does not entail full review of tribal court procedures, as this would vitiate the deference that the doctrine dictates. Instead, federal courts generally apply this exception only when the complete lack of a functioning tribal court renders tribal remedies unavailable and therefore futile.[93] The record is clear that a tribal appellate remedy was available and that

_____

[92]    For comparison, Alaska Rule of Appellate Procedure 204(e) directs the appellant to "serve and file a *concise* statement of the points on which appellant intends to rely in the appeal." (Emphasis added.) This rule does not violate the requirements of minimum due process or make appeal meaningless.

[93]    *See, e.g.*, *Comstock Oil & Gas Inc. v. Alabama & Coushatta Indian Tribes of Texas*, 261 F.3d 567, 572 (5th Cir. 2001) ("Because no tribal court properly existed, exhaustion was imprudent in the present dispute."); *Johnson v. Gila River Indian Cmty.*, 174 F.3d 1032, 1036 (9th Cir. 1999) ("Delay alone is not ordinarily sufficient to show that pursuing tribal remedies is futile. However, if a functioning appellate court does not exist, exhaustion is per se futile."); *Krempel v. Prairie Island Indian Cmty.*, 125 F.3d 621, 622 (8th Cir. 1997) ("[I]f there is no functioning tribal court, exhaustion would be
(continued...)

Parks was aware of this fact before he brought his collateral attack on the Minto Tribal Court's judgment in the superior court.

The State couches its futility argument in terms of whether tribal appellate review would have been "meaningful," arguing that "if required to exhaust tribal remedies, Parks would still be hindered by the restriction on oral advocacy by attorneys" even though his attorney would have been permitted to submit written briefing on his jurisdictional objections. In considering the State's futility argument, we rely on our discussion of comity in *John I*,[94] but we also recognize that full faith and credit requires even greater deference to tribal court judgments than does comity.[95] In our discussion of the due process requirements for granting comity, we emphasized that proceedings in tribal courts must not be evaluated by unreflective comparison with state and federal judicial procedures.[96] The critical question is "whether the parties received notice of the proceedings and whether they were granted a full and fair opportunity to be heard before an impartial tribunal that conducted the proceedings in a regular fashion."[97] We have also cautioned state court judges against importing their own views on proper procedure: "[T]his due process analysis in no way requires tribes to use procedures identical to ours in their courts. The comity analysis is not an invitation for our courts to deny recognition

---

[93](...continued)
futile and therefore would not be required."); *see also* COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 7.04[3], at 632 (Nell Jessup Newton ed., 2012) [hereinafter COHEN'S HANDBOOK] ("The 'futility' exception applies generally only when the tribe does not have a functioning court system.").

[94]    982 P.2d 738, 763-64 (Alaska 1999).

[95]    *Starr v. George*, 175 P.3d 50, 53 (Alaska 2008).

[96]    *John I*, 982 P.2d at 763.

[97]    *Id.*

to tribal judgments based on paternalistic notions of proper procedure."[98]   We have clarified that "in deciding whether a party was denied due process, superior courts should strive to respect the cultural differences that influence tribal jurisprudence, as well as to recognize the practical limits experienced by smaller court systems."[99]   This accords with our generally applicable precedent that "[d]ue process is flexible, and the concept should be applied in a manner which is appropriate in the terms of the nature of the proceeding."[100]

We have also expressly warned that when evaluating tribal court judgments, state court judges "should not deny recognition to tribal judgments simply because they disagree with the outcome reached by the tribal judge or because they conclude that they could better resolve the dispute at issue."[101]   In *John I*, we admonished that "suggesting—as the superior court did in this case—that state jurisdiction was proper because 'significant expertise will be required to resolve this difficult dispute,' has no place in a comity analysis."[102]   Nor does it have any place in a full faith and credit analysis or in establishing the futility exception to the exhaustion requirement.  The United States Supreme Court has similarly "rejected . . . attacks on tribal court jurisdiction" based on allegations of "local bias and incompetence" and has made clear that "[t]he alleged incompetence of tribal courts is not among the exceptions to the

---

[98]     *Id.*

[99]     *Id.*

[100]     *Flores v. Flores*, 598 P.2d 893, 895 (Alaska 1979) (citation and internal quotation marks omitted).

[101]     *John I*, 982 P.2d at 763 (citing *Hilton v. Guyot*, 159 U.S. 113, 202-03 (1895)).

[102]     *Id.* at 763-64.

exhaustion requirement established in *National Farmers Union*."[103]  We therefore reject any hint of inadequacy of review that might be inferred from the State's characterization of the Minto Tribal Court as a " 'relational' tribal court that applies unwritten, cultural law" and "is unfamiliar with core Western jurisdictional concepts."  As the First Circuit forcefully stated:

> The unsupported averment that non-Indians cannot receive a fair hearing in a tribal court flies in the teeth of both congressional policy and the Supreme Court precedents establishing the tribal exhaustion doctrine.  The requirements for th[e futility] exception are rigorous; . . . a party cannot skirt the tribal exhaustion doctrine simply by invoking unfounded stereotypes.[104]

The State focuses on the necessity of attorney oral argument for Parks to meaningfully present his jurisdictional objections to the Minto Tribal Court or the Minto Court of Appeals.  But if the "jurisdictional question here is a complex question governed by federal case law," as the State asserts, written argument could be preferable to oral presentation of complex federal precedent.  And the State presents no authority for its conclusion that oral argument is necessary to make an appeal meaningful; instead the State conflates the familiar with the necessary, measuring the role of Parks's counsel in the tribal appellate court against what would be typical in an federal or state appellate court.  Furthermore, many state appellate courts do not grant oral argument as a matter

---

[103]    *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 18-19 (1987).

[104]    *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 34 (1st Cir. 2000).

of right,[105] and we would not allow the State to undermine the decisions of these courts on that basis.

The State and Parks fail to establish that appeal to the Minto Court of Appeals would not have provided "an adequate opportunity to challenge the [tribal] court's jurisdiction."[106] Because a tribal appellate remedy was available to Parks, we conclude that he fails to satisfy the futility exception to the exhaustion doctrine.

### 3. Parks fails to satisfy the exception under which a party need not exhaust tribal court remedies when it is plain that the tribal court lacked jurisdiction.

In a footnote in *Strate v. A-1 Contractors*, the United States Supreme Court recognized a fourth exception to the exhaustion of tribal remedies doctrine when "it is plain that . . . tribal courts lack adjudicatory authority."[107] In such cases, "the otherwise applicable exhaustion requirement must give way, for it would serve no purpose other than delay."[108] The Ninth Circuit "ha[s] equated that inquiry with whether jurisdiction

---

[105] *See, e.g.*, PA. R. APP. P. 3813 ("There is no right to oral argument before an appellate court. The Supreme Court will consider any request for oral argument set forth in a petition for review and, if granted, will notify interested parties of the time, place and manner of oral argument."); *Brown v. Glover*, 16 P.3d 540, 544 (Utah 2000) ("Clearly, while an appeal as of right exists, there is no specific right to oral argument under Utah law. In fact, rule 29 specifically states reasons for which an appellate court need not grant oral argument."); *see also* FED. R. APP. P. 34(a)(2) (providing for the disposition of federal appeals without oral argument).

[106] *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856 n.21 (1985).

[107] 520 U.S. 438, 459 n.14 (1997).

[108] *Id.* (citation omitted).

is 'colorable' or 'plausible.' "[109] Under this exception, excusal of exhaustion of tribal remedies is justified only when tribal adjudicatory authority is so plainly foreclosed by law that the tribal court has no colorable or plausible claim to jurisdiction.[110] A leading treatise similarly concludes that "[w]here the Supreme Court has not yet clearly foreclosed tribal jurisdiction, . . . the policies behind the exhaustion requirement itself dictate that tribal courts be permitted to first review the jurisdictional question."[111] As we explain below, tribal courts should be permitted to review fully the type of jurisdictional objections raised by Parks because tribal jurisdiction in this case is, at the very least, colorable and plausible. This approach is consistent with Congress's structuring ICWA to validate the importance of tribal court jurisdiction in this context.

a. **The Minto Tribal Court had a colorable and plausible claim to jurisdiction over this case.**

In applying *Strate*'s jurisdictional exception, we conclude that the Minto Tribal Court had, at the very least, a colorable and plausible claim to jurisdiction to terminate Parks's and Stearman's parental rights to S.P. The Ninth Circuit has applied the colorable or plausible tribal jurisdiction review standard to cases with facts quite similar to those in this case and has concluded that tribal jurisdiction over a non-tribal

---

[109] *Atwood v. Fort Peck Tribal Court Assiniboine*, 513 F.3d 943, 948 (9th Cir. 2008).

[110] *Id.*; *see also Elliott v. White Mountain Apache Tribal Court*, 566 F.3d 842, 848 (9th Cir. 2009) ("If 'jurisdiction is "colorable" or "plausible," ' " then the exception does not apply and exhaustion of tribal court remedies is required." (citation omitted)); *Marceau v. Blackfeet Hous. Auth.*, 540 F.3d 916, 920 (9th Cir. 2008) ("Principles of comity require federal courts to dismiss or to abstain from deciding claims over which tribal court jurisdiction is 'colorable,' provided that there is no evidence of bad faith or harassment." (citation omitted)).

[111] COHEN'S HANDBOOK, *supra* note 93, § 7.04[3], at 633.

-43-                                                        **6926**

member was not plainly lacking so that exhaustion of tribal remedies was required.[112]

For example in *Atwood v. Fort Peck Tribal Court Assiniboine*, the Ninth Circuit held that the non-Indian father was required to exhaust tribal remedies in a child custody dispute before he could challenge tribal jurisdiction in federal court.[113] The court concluded that "it is not 'plain' that tribal court jurisdiction is lacking . . . [,] equat[ing] that inquiry with whether jurisdiction is 'colorable' or 'plausible.' . . . [T]he suit primarily concerns [the child], who *is* a member of the tribe. Although the rights of non-member Plaintiff are affected, it is not clear that that fact alone would strip the Tribal Court of jurisdiction."[114]

In *John I*, our foundational decision on tribal jurisdiction over child custody,[115] we considered the adjudication of a custody dispute between two parents from different Alaska Native Villages.[116] In that case, the mother consented to the jurisdiction of the father's tribal court, and we were called upon to decide whether the tribal court had concurrent jurisdiction with the state court over the custody dispute.[117] Although the custody dispute fell outside of ICWA, "we conclude[d] that ICWA

---

[112] *See, e.g., Atwood*, 513 F.3d at 948; *Boozer v. Wilder*, 381 F.3d 931, 935-37 (9th Cir. 2004).

[113] 513 F.3d at 948.

[114] *Id.* (emphasis in original); *see also Boozer*, 381 F.3d at 935-37 (upholding the dismissal of a non-Indian father's suit challenging tribal jurisdiction over a custody dispute concerning his daughter, who was a tribal member, for failure to exhaust tribal remedies).

[115] *State v. Native Village of Tanana*, 249 P.3d 734, 750 (Alaska 2011) ("*John v. Baker* is foundational Alaska authority regarding Alaska Native tribal jurisdiction over the welfare of Indian children . . . .").

[116] *John I*, 982 P.2d 738, 743 (Alaska 1999) ("Ms. John is a member of Mentasta Village and Mr. Baker is a member of Northway Village.").

[117] *Id.*

provides the most appropriate test for deciding when a tribal court has subject matter jurisdiction over a particular custody dispute. Under ICWA, the relevant factor is the *child's* tribe."[118] We explained:

> Although Ms. John is not a member of Northway Village, she argues that the children themselves are eligible for tribal membership. This is a critical fact that must be determined by the superior court on remand . . . . A tribe's inherent sovereignty to adjudicate internal domestic custody matters depends on the membership or eligibility for membership of the child. Such a focus on the tribal affiliation of the children is consistent with federal statutes such as ICWA, which focuses on the child's tribal membership as a determining factor in allotting jurisdiction. Because the tribe only has subject matter jurisdiction over the internal disputes of tribal members, it has the authority to determine custody only of children who are members or eligible for membership.[119]

We concluded that "an action for determination of custody of the children of a member of Northway Village . . . falls squarely within Northway's sovereign power to regulate the internal affairs of its members."[120]

In *John I*, there was some question whether the children were in fact tribal members or eligible for tribal membership under tribal law.[121] The case was remanded to the superior court to determine the children's membership status under tribal law[122] in accordance with the United States Supreme Court's precedent in *Santa Clara Pueblo*

---

[118] *Id.* at 764 (emphasis in original).

[119] *Id.* at 759 (citation omitted).

[120] *Id.*

[121] *Id.* at 764.

[122] *Id.*

*v. Martinez* that "[a] tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community."[123] On remand, the superior court determined that the children were eligible for membership, and we subsequently upheld the tribal court's jurisdiction on the basis of the children's eligibility for membership.[124]

Our conclusion that the Minto Tribal Court's claim of jurisdiction over the custody of S.P. is plausible is consistent with case authority and the views of scholars and commentators on tribal jurisdiction in ICWA-defined child custody proceedings. "The Act accommodates Indian children with mixed parentage from intertribal marriages," and tribal jurisdiction and intervention rights depend solely on the membership status of the child.[125] In *Kaltag Tribal Council v. Jackson*,[126] where "[t]he

---

[123]     *Id.* at 764 n.187 (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72 n.32 (1978)) (internal quotation marks omitted).

[124]     *John II*, 30 P.3d 68, 73 (Alaska 2001) ("On remand, we instructed the superior court to determine the children's membership status by applying tribal law. The superior court did so and concluded that the children were eligible for membership. . . . Because the superior court correctly determined that Northway had subject matter jurisdiction over this case, it properly concluded that there exists no jurisdiction-based reason to deny comity to Northway's order." (citation omitted)).

[125]     COHEN'S HANDBOOK, *supra* note 93, § 11.02[3], at 838 ("The quality or nature of the member-parent's or child's relationship with the tribe should not be germane [in the ICWA context] once it is established that the parent or child is a member of a federally recognized tribe or that the child is eligible to be a member.").

[126]     No. 3:06-cv-211 TMB, 2008 WL 9434481 (D. Alaska Feb. 22, 2008), *aff'd*, 344 F. App'x 324 (9th Cir. 2009).

issue . . . [was] whether the tribal court had concurrent jurisdiction with the State to initiate a child protection matter,"[127] the federal district court explained:

> Defendants note that the Alaska Supreme Court has held that a "tribe only has subject matter jurisdiction over the internal disputes of *tribal members*." [*John I*, 982 P.2d at 759.] Similarly, in *Venetie*, the Ninth Circuit noted in a footnote that "[a] tribe's authority over its reservation or Indian country is incidental to its authority over its members." [*Native Village of Venetie I.R.A. Council v. State of Alaska*, 944 F.2d 548, 559 n.2 (9th Cir. 1991) (citation omitted).] However, it is the membership of the child that is controlling, not the membership of the individual parents.[128]

As the Simmondses note, this was the position taken by the United States Solicitor General in advocating the denial of certiorari by the United States Supreme Court in *Kaltag*.[129] Certiorari was denied, leaving intact the Ninth Circuit's affirmance of the district court's conclusion that the tribal court in *Kaltag* had jurisdiction despite the nonmember status of one of the parents.[130]

---

[127]    *Id*. at *3.

[128]    *Id*. at *6 (emphasis and alteration in original) (citations in footnotes relocated to main text).

[129]    *Hogan v. Kaltag Tribal Council*, 131 S. Ct. 66 (2010). The Solicitor General set out arguments very similar to those of the Simmondses. *See* Brief for the United States as Amicus Curiae at *12, *Hogan*, 131 S. Ct. 66 (No. 09-960), 2010 WL 3391759 ("ICWA's jurisdictional scheme appropriately focuses on the status of the child at the heart of the custody proceeding, not the identities of other parties . . . . Neither tribal jurisdiction under Section 1911(a) and (b), nor Section 1911(d)'s requirement to extend full faith and credit to tribal proceedings is subject to an exception based on the membership status of some other party.").

[130]    *Kaltag*, 2008 WL 9434481, at *6.

**b.** **The State's argument — that *Montana* and *Strate* create a dispositive presumption against tribal jurisdiction so that exhaustion was not required in this case — is unavailing.**

The State argues that "even if [Parks's] case is subject to the federal . . . exhaustion requirement, it falls under the exception that applies when 'it is plain that no federal grant provides for tribal governance of nonmembers' conduct,' such that exhaustion 'would serve no purpose other than delay.' " The State asserts that "federal case law presumes that tribes lack jurisdiction over nonmembers, especially on non-Indian fee land," relying heavily on the State's interpretation of *Montana v. United States*[131] and *Strate v. A-1 Contractors*[132] to argue that "it is plain that the Minto Tribe does not have jurisdiction over Parks." The State argues that *Montana* and *Strate* read in conjunction constitute a "presumptive lack of jurisdiction" so that the exhaustion requirement does not apply. We disagree. The United States Supreme Court has repeatedly and explicitly emphasized the context-bound nature of each of its rulings on tribal court civil jurisdiction, looking to various indices of congressional and executive action and intent in enlarging or diminishing retained inherent tribal sovereignty. We decline to read into the Supreme Court's precedent a presumption that applies ecumenically across all contexts so that the Minto Tribal Court had no colorable or plausible claim to jurisdiction over custody matters affecting S.P.

In *Montana v. United States*, the United States Supreme Court considered whether a tribe's regulatory authority included the "regulation of hunting and fishing by

---

[131]    450 U.S. 544 (1981).

[132]    520 U.S. 438 (1997).

nonmembers of a Tribe on lands no longer owned by the Tribe."[133] The Court concluded that while "Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members," the regulation at issue was not authorized by "the general principles of retained inherent sovereignty."[134] The Court articulated "the general proposition" that unless there has been "express congressional delegation" the "inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," subject to two exceptions.[135]

While the *Montana* Court stated its "general proposition" in categorical terms, its actual conclusion depended on its examination of federal executive and legislative action and intent regarding the regulation at issue.[136] This sensitivity to the federal government's plenary authority over Indian affairs, including Congress's power to determine tribal authority over nonmembers, was emphasized by the Court in *National Farmers Union Insurance Companies v. Crow Tribe of Indians*, where the Court held that "the existence and extent of a tribal court's [civil] jurisdiction will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered,

---

[133]    450 U.S. at 564.

[134]    *Id.* at 564-65.

[135]    *Id.* at 565. The first exception concerned a tribe's regulation "through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Id.* The second exception involved a tribe's "retain[ed] inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 566.

[136]    *Id.* at 557-63.

divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions."[137]

In *Strate*, the Court extended the *Montana* framework governing tribal regulatory authority to tribal civil adjudicatory authority referring to the *Montana* decision as "pathmarking."[138] As in *Montana*, the *Strate* Court described its framework on tribal civil adjudicatory authority over nonmembers in broad, categorical terms: "[A]bsent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land . . . subject to two exceptions . . . ."[139] But the Court took pains to clarify that *Strate* was not overruling *National Farmers Union* on the basis of *Montana*.[140] And the Court also reaffirmed that the *Montana* Court "examined the treaties and legislation relied upon by the Tribe" and "[o]nly after and in light of that examination did the Court address the Tribe's assertion of 'inherent sovereignty.' "[141]

In *Nevada v. Hicks*, the Court considered tribal court jurisdiction over state law enforcement officers who had executed a search warrant on tribal land.[142] The Court made clear that "[t]he principle of Indian law central to this aspect of the case is our

---

[137]     471 U.S. 845, 855-56 (1985) (citation omitted).

[138]     *Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997).

[139]     *Id.* at 446.

[140]     *Id.* at 448 ("*National Farmers* and *Iowa Mutual*, we conclude, are not at odds with, and do not displace, *Montana*.").

[141]     *Id.* at 449-50.

[142]     533 U.S. 353, 355 (2001).

holding in *Strate*"[143] but also concluded that "[o]ur holding in this case is limited to the question of tribal-court jurisdiction over state officers enforcing state law. We leave open the question of tribal-court jurisdiction over nonmember defendants in general."[144] In her concurrence, Justice Ginsburg emphasized this point.[145] She wrote separately specifically to make clear that neither the holding in *Hicks* nor the holding in *Strate* should be presumed to answer tribal civil jurisdictional issues beyond their specific facts: "I write separately only to emphasize that *Strate v. A-1 Contractors* similarly deferred larger issues. . . . The Court's opinion, as I understand it, does not reach out definitively to answer the jurisdictional questions left open in *Strate*."[146]

In her concurrence in part, Justice O'Connor similarly clarified that she did not interpret *Montana* or its extension to tribal adjudicatory authority in *Strate* to establish "a broad *per se* rule prohibiting tribal jurisdiction over nonmembers."[147] Rather than establishing a rigid framework, *Montana* "provides principles that guide our determination of whether particular activities by nonmembers implicate [tribal] sovereign interests to a degree that tribal civil jurisdiction is appropriate."[148] "Saying that tribal jurisdiction must 'accommodat[e]' various sovereign interests does not mean that tribal

---

[143]  *Id*. at 357.

[144]  *Id*. at 358 n.2.

[145]  *Id*. at 386 (Ginsburg, J., concurring).

[146]  *Id*. (citation omitted).

[147]  *Id*. at 396 (O'Connor, J., concurring in part).

[148]  *Id*. at 392.

interests are to be nullified through a *per se* rule."[149] Justice O'Connor also noted that

"[w]e refused to foreclose entirely the civil jurisdiction of tribal courts over nonmembers

as we had foreclosed inherent criminal jurisdiction over nonmembers"[150] and reiterated

the language from *National Farmers Union* quoted above.[151]

In sum, reading *Montana*, *Strate*, and *Hicks* in conjunction, it is clear

that *Montana*'s "general proposition" that tribal sovereign power "do[es] not extend to

the activities of nonmembers" absent "express congressional delegation"[152] must still be

interpreted in light of relevant action by the political branches of the federal government.

Furthermore, *Strate* and *Hicks* explicitly limit their holdings on tribal jurisdiction to the

facts of each case.[153] As Justice Souter, also concurring in *Hicks*, noted, "[t]ribal

---

[149]     *Id.* at 395 (alteration in original) (citation omitted).

[150]     *Id.* at 398-99.

[151]     *Id.* at 399 (quoting *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 855-56 (1985)) ("[T]he existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions.").

[152]     *Montana v. United States*, 450 U.S. 544, 564-65 (1981).

[153]     Similarly, the Court in *Plains Commerce Bank v. Long Family Land & Cattle Co.* rearticulated *Montana*'s "general proposition" as making "efforts by a tribe to regulate nonmembers, especially on non-Indian fee land, . . . 'presumptively invalid,' " 554 U.S. 316, 330 (2008) (citation omitted), but proceeded to analyze federal executive and legislative intent with regard to the specific factual context of tribal regulation of the sale of non-Indian fee land: "In commenting on the policy goals Congress adopted with the General Allotment Act, we noted that '[t]here is simply no suggestion' in the history of the Act 'that Congress intended that the non-Indians who would settle upon alienated allotted lands would be subject to tribal regulatory authority.' " *Id.* at 337 (alteration in
(continued...)

adjudicatory jurisdiction over nonmembers is . . . ill-defined, since this Court's own pronouncements on the issue have pointed in seemingly opposite directions."[154] We reject the State's argument that these precedents create a "presumptive lack of [tribal] jurisdiction" over nonmembers so that Minto Tribal Court had no colorable or plausible claim to jurisdiction and Parks was not required to exhaust tribal remedies before instituting his state court action.

The State does not cite a single federal or state court case in which the *Montana* framework has been applied to deny full faith and credit to a tribal court judgment in an ICWA-defined child custody proceeding because one of the parents was a non-tribal member, let alone a case where a court has held that tribal jurisdiction was so plainly lacking as to excuse exhaustion of tribal remedies. The superior court noted that "[o]ne state supreme court has recently assumed *Montana*'s application in the ICWA context where a tribe attempts to terminate the parental rights of a nonmember and opined (in dicta) the tribe was without jurisdiction to do so," referring to the Minnesota Supreme Court's decision in *In re Welfare of R.S.*[155] The superior court was correct to note that the one sentence reference to *Montana* in the *R.S.* case was dicta as the Minnesota Supreme Court was concerned with the application of ICWA to preadoptive placement proceedings, not with the jurisdiction of tribal courts to terminate the parental rights of non-tribal members.[156] When presented with an argument against the

---

[153](...continued) original) (citation omitted).

[154]     533 U.S. at 376 (Souter, J. concurring) (alterations in original) (citation and internal quotation marks omitted).

[155]     805 N.W.2d 44, 53 (Minn. 2011).

[156]     *Id.* ("Although not essential to our resolution of the case, we nevertheless (continued...)

jurisdiction of a tribal court to terminate the parental rights of a non-tribal member parent, the Virginia Court of Appeals persuasively distinguished *R.S.* as limited to the issue of tribal jurisdiction over preadoptive placement proceedings.[157] The Virginia court concluded that "[ICWA] does not limit tribal court jurisdiction to cases where both parents are Indian. . . . It applies to parents of Indian children across the board. The absence of an express mention of non-Indian parents does not alter the plain language reading of the statute."[158]

In the context of this appeal, we need decide only whether the Minto Tribal Court's claim to jurisdiction, based on S.P.'s membership or eligibility for membership in the Native Village of Minto, is colorable or plausible. After our "careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions,"[159] we conclude that the Minto Tribal Court's claim to jurisdiction is both colorable and plausible. Therefore, Parks does not satisfy the exception to the exhaustion of tribal remedies doctrine identified in *Strate*.

---

[156](...continued)
address this [question].").

[157]    *Thompson v. Fairfax Cnty. Dep't of Family Servs.*, 747 S.E.2d 838, 849 (Va. App. 2013) ("The issue before the court in [*R.S.*] was whether Congress intended to permit transfer of adoptive and pre-adoptive placement proceedings to tribal courts. . . . Thus, the decision in *R.S.* does not support the argument that the tribal court lacks jurisdiction to terminate father's parental rights.").

[158]    *Id.* (citing *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) ("[W]hen the statutory language is plain, we must enforce it according to its terms.")).

[159]    *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 855-56 (1985) (citation omitted).

**F.    Summary**

The Minto Tribal Court's decision to terminate the parental rights of Parks and Stearman is entitled to full faith and credit under ICWA because they failed to exhaust tribal court remedies before collaterally attacking the decision in state court. Full faith and credit entails a high degree of respect for tribal courts. As a measure of that respect, we decline to allow Parks to relitigate his minimum due process and jurisdictional claims in Alaska state courts when he failed to exhaust tribal remedies by appealing to the Minto Court of Appeals. Parks has not satisfied any of the exceptions to the exhaustion of tribal remedies doctrine. We therefore conclude his suit in Alaska state court must be dismissed.

**V.    CONCLUSION**

We REVERSE the superior court's order denying full faith and credit to the Minto Tribal Court's decision terminating the parental rights of Parks and Stearman and REMAND for dismissal of Parks's state court claim with prejudice.